UTAH POWER & LIGHT CO. v. OGDEN CITY et al.
(GENERAL CONTRACTORS ASS'N OF UTAH, Intervener).

No. 5868.   Decided May 16, 1938.   (79 P. 2d 61.)

162

George R. Corey, Calvin Behle, and Shirley P. Jones, all of Salt Lake City, and Devine, Howell & Stine, of Ogden, for plaintiff.

George S. Barker, of Ogden, Dey, Hoppaugh, Mark & Johnson, of Salt Lake City, and R. E. More and H. D. Roberts, both of Denver, for defendants.

Badger, Rich & Rich, of Salt Lake City, for plaintiff in intervention.

HANSON, Justice.

This is an original action in prohibition and certiorari to review action taken and prohibit further action by defendants pertaining to a contract with one A. C. Todd for the construction of an electric light and power plant and distributing system in Ogden, Utah. The defendant Peery is mayor of defendant City; Peery, Saunders, and O'Connor are the city commissioners; and Ballantyne is city recorder of the city.

The admitted facts are that on August 26, 1936, defendants city commissioners (except O'Connor) adopted City Ordinance No. 47, authorizing the contract complained of, and pursuant thereto executed said contract with Todd on behalf of the city. By the contract Todd agreed to construct and deliver to defendant city a complete municipal light and power plant and distributing system in consideration of $2,600,000 in special revenue bonds of the city, payable out

of the net earnings of the proposed plant. A copy of the contract and ordinance are attached to the petition as exhibits and are admitted by the answer. It is charged that the contract and ordinance are illegal and void for reasons later to be stated herein.

The petition was filed in this court, and an alternative writ issued on September 25, 1936, prohibiting further action in the matters complained of until the further orders of the court, and requiring defendants to show cause, etc., and to certify up to this court a record of proceedings already taken.

On November 12, 1936, the General Contractors Association of Utah, a corporation, on leave granted, filed its petition in intervention in which it, by reference, adopted and repeated the averments of plaintiff's petition, added other allegations, and prayed the same relief as that prayed by the plaintiff. Defendants answered both petitions, defendant O'Connor answering separately agreeing with plaintiff and disapproving the action taken by his associate city commissioners.

On February 16, 1937, after briefs were filed and while the action was awaiting a hearing in this court, plaintiff filed in this court its supplemental petition alleging that the defendants (except O'Connor) did on February 11, 1937, in disregard of the court's writ of prohibition, pass a resolution and attempt to enter into a purported supplemental agreement with said A. C. Todd based upon the prior agreement of August 26, 1936, for the construction of said light and power plant and system and the issuance of bonds in payment therefor, and also did on said date pass and adopt its Ordinance No. 49, amending its said prior Ordinance No. 47 of August 26, 1937, approving and authorizing said supplemental agreement. Copies attached as exhibits.

It is alleged that the amendatory proceedings cover the same subject matter, and the identical light and power plant and system covered by the original proceedings complained of, are open to the same objections, and by reference the

same averments are made and others are added thereto. It is further alleged and shown that a referendum petition signed by the requisite number of voters of defendant city had been filed whereby the original Ordinance No. 47 had been referred to a vote of the electorate prior to the issuance and service of the writ of prohibition suspending all further proceedings. It is claimed that thereby and by the said writ the defendants were deprived of power to proceed further, by amendments or otherwise. It is also charged that the amendatory proceedings constitute a contempt of this court. The prayer is, inter alia, that the defendants (except O'Connor) be not permitted to appear or defend until they have purged their contempt by rescinding the supplemental contract and repealing the amending Ordinance No. 49.

The court is of opinion that no contempt was committed or attempted by the defendants city commissioners in this respect. Their answer and the amendatory contract and ordinance purport to show that the purpose was, while not conceding plaintiff's contentions regarding the original contract and ordinance, to obviate some of the objections thereto in matters of detail, clarify others, and to reduce to as narrow a scope as possible the questions remaining for decision. The situation now is the same in substance as it was before the amendatory action was taken, namely, a contract and ordinance authorizing acquisition of a municipal electric light and power plant with no further step taken in prosecution of the enterprise. Defendants disclaim any intention of proceeding further.

While not all of the objections to the original contract and ordinance were met by the supplementary ones, yet substantial changes and additions thereto were made. It cannot be said that the two were identical and the latter without substance, hence contemptuous. The power of the city to contract and to adopt ordinances was not exhausted by the first. Its effort to obviate objections made and to narrow the grounds of controversy, without

any intention to circumvent the process and orders of this court by proceeding further, is unobjectionable. The filing of the referendum petition against the Ordinance No. 47 without further action thereon or the holding of an election did not nullify it, but only suspended its enforcement until voted on. Neither did the writ of prohibition and certiorari nullify the ordinance and contract or either of them. It did not prohibit a new contract or ordinance remedying defects or objections made to the suspended contract and ordinance, if practicable, as was the effort here, without any intention of proceeding further until this court's final decision. Our decision in *Keigley* v. *Bench,* 90 Utah 569, 63 P. 2d 262, is closely in point. We there held that the action of the city commission in repealing an ordinance while a referendum petition against it was being tendered for filing and should have been filed, was effective and rendered the whole question moot. The following cases from other states are also closely similar in facts and to the point; we approve of and adopt the rules of law laid down therein: *Ginsberg* v. *Kentucky Utilities Co.,* 260 Ky. 60, 83 S. W. 2d 497; *Ex parte Statham,* 45 Cal. App. 436, 187 P. 986; *In re Megnella,* 133 Minn. 98, 157 N. W. 991; *McBride* v. *Kerby,* 32 Ariz. 515, 260 P. 435.

The answer to the supplementary petition was properly filed, and we proceed now to the merits.

It is conceded that the proposed $2,600,000 bond issue for which provision is made in the contract and ordinance is in excess of the defendant city's revenue for the current year, and that the question of issuance of the bonds had not been submitted to a vote of the qualified taxpaying electors of the city. It is also admitted that the amount of the bonds, added to that of existing valid outstanding bonds of the city, will exceed the limit of indebtedness permitted to the city by the provisions of sections 3 and 4 of article 14 of the Constitution of the State of Utah. It is, however, further conceded and the contract shows upon its face that:

"It is mutually agreed and understood that all obligations herein contained on the part of the City are limited solely to the funds to be received from the contractor, or from revenues of the system to be acquired hereunder, and such obligations are not chargeable against the general funds of the City, or funds derived from taxes levied therein." (Article VI.)

"The light and power revenue bonds issued under this contract shall be payable solely out of the net profits derived from the operation of said system, and not otherwise. * * *" (Amended specification No. 7.)

"It is understood and agreed that said light and power revenue bonds are not to be construed as a lien or mortgage against the general funds or any other fund of the City raised by taxation, or a mortgage against any real or other property of the City, and that full title to the power plant, distribution system, and street lighting system passes to the City immediately upon acceptance of the same by the City from the contractor upon completion of the contract, and free and clear of all encumbrances except any lien created on the net revenues thereof by the issuance of said revenue bonds." (Amended specification No. 7.)

"It is further understood and agreed that none of the obligations of the City contained in the bonds shall require, or shall be construed as requiring the City in the performance thereof to expend any of its general funds, or funds derived from taxation, or from any source other than the funds derived by the City from the contractor, or from the ownership and operation of the plant and system being acquired hereunder." (Amended specification No. 7.)

Section 2 of both the original and amendatory ordinances of the City contain the same restriction to the net revenues from operation of the proposed system as the sole and only source of payment of the proposed revenue bonds. Section 4 of both ordinances, prescribing the form of the proposed bonds, reads as follows in part:

"Ogden City * * * hereby promise to pay to the bearer hereof out of the special fund hereinbelow designated, but not otherwise, the sum of One Thousand Dollars, in lawful money," etc.

"This bond is one of an authorized issue of $2,600,000.00 issued or to be issued in payment for electric light and power system * * * and for extensions or betterments thereto, * * * Both the principal of this bond and all interest hereon are payable solely out of a special fund created in full conformity with law and designated the 'Ogden

Light and Power Fund,' to contain the revenues derived and to be derived from said electric power and light system, all as more fully set out in the ordinance of the City authorizing the issuance of the bonds of which this is one. * * *

"In no event is the City obligated to pay this bond or the interest thereon from the general funds of the City or from taxes levied upon any of the property therein."

(The interest coupon form attached to and following the form of the bond, supra, contains the same limitation and restriction on source of payment thereof as the bond.)

Section 8, paragraph F, relating to budgeting by the city, provides:

"* * * but the City shall in no event be obligated to appropriate any of its general funds or tax revenues to any such payments or purposes."

Section 10 provides, inter alia:

"None of the covenants, agreements, representations and warranties contained in this ordinance, or in the bonds issued hereunder, shall ever impose, or be construed as imposing, any liability, obligation or charge against the City, or its general credit, payable out of its general fund, or out of any funds derived from taxation, or from any source other than from the ownership and operation of the electric light and power system."

Article III of the proposed contract provides that:

"The City shall establish a special fund to be known as the 'Ogden Light and Power Fund' into which shall be paid:

"1. All revenue derived by the City from the operation or ownership of the said light and power system acquired by the city under the provisions of this contract.

"2. All moneys in the Ogden Light and Power Fund not paid to the paying agent to meet the next maturing installment of principal and interest, and not set aside for the Reserve Fund, shall be deposited * * * in banks. * * *

"3. In the exercise from time to time of its power to fix, establish and regulate rates and charges for light and power, the City, by appropriate action of its Board of Commissioners, will establish and use its best efforts to collect a schedule of charges for light and power

furnished to consumers, including the City, by means of the property acquired under the provisions of this contract, and by means of any extensions thereof, additions and betterments thereto, and improvements thereon, which shall be sufficient at all times punctually to pay the interest accruing upon said bonds, to discharge the principal thereof at maturity, to cover all expenses of operation and maintenance, and to accumulate the reserve herein specified, * * * subject to the limitation that such charges shall at all times be reasonable as to the service rendered and uniform in respect to class.

"4. *Disbursements from Fund.* The City shall use said Ogden Light and Power Fund for the following purposes and payments and none other, to-wit:" (Specifications in brief:)

A. The costs and expenses of efficient and economical operation of the plant (stated in detail).

B. A reasonable reserve for depreciation and obsolescence not less than 3 per cent nor more than 10 per cent of the gross revenues.

C. The annual installments of principal and interest on the revenue bonds to be issued in payment for the plant.

D. Out of any excess earnings a fund of $50,000 working capital to be built up.

E. Annually, out of any excess earnings over the above classified outlays, contributions are to be made to a reserve fund of $200,000 (directions for investment and preservation), to be used only to meet payments of principal and interest on the revenue bonds at any time or times when the revenues from operation of the plant may be insufficient; provided, the city may in its discretion call and pay bonds from money in this reserve fund.

F. After meeting the foregoing, any balance of annual earnings may be used to defray cost of extensions, additions, betterments, or improvements upon the plant which will improve the service or produce net revenues, or to purchase, call, or redeem bonds.

Further provisions of the contract may be referred to as we proceed with our discussion. Manifestly the quoted provisions of the contract, bonds, and controlling ordinance bring this case directly within the "special fund" doctrine

as recognized by this court in *Barnes* v. *Lehi City,* 74 Utah 321, 279 P. 878, and our subsequent decisions in the cases of *Fjeldsted* v. *Ogden City,* 83 Utah 278, 28 P. 2d 144; *Wadsworth* v. *Santaquin City,* 83 Utah 321, 28 P. 2d 161; and *Utah Power & Light Co.* v. *Provo City,* 94 Utah 203, 74 P. 2d 1191. In harmony therewith, it must be held that the proposed revenue bonds in this case will not, if or when issued, be an indebtedness of the defendant City, and will not be invalid or void because of the limitation of debt contained in sections 3 and 4 of article 14 of the State Constitution. In no event will the City be legally or morally obligated for their payment. If the earnings of the proposed plant shall at any time prove insufficient to meet the obligations charged thereon, neither the defendant Ogden City nor any of its property, revenues, taxes, or other sources can be called upon to make good the deficiency.

We are not here concerned with the limitation upon the special fund doctrine recognized by this court in the Fjeldsted and Wadsworth Cases, supra, to the effect that the revenues or income from an existing plant or utility cannot be pledged in addition to the revenues of an enlarged, improved or extended plant, to pay the cost of the improvements. In the instant case, Ogden City has no electric light or power plant or system. It is starting out to acquire one and to pay for it solely out of the earnings of that which it does not now possess even in small part. There is no place in the present plan for the contention that these earnings of the proposed plant are to be fed or fattened upon any revenues or resource the city now has or would have without the fruits of the contract and ordinance under attack in this case. The proposed plant must earn and pay for itself. To its earnings alone the holders of the proposed revenue bonds must look for payment. All contentions to the contrary must be overruled.

We are earnestly urged to reconsider and repudiate the special fund doctrine of our previous decisions. We have no disposition to do so. The principles upon which it rests have

been repeatedly examined by this court. It is now firmly established and supported not only by our own repeated decisions, but by the overwhelming weight of authority in our sister states. A citation of many of these will be found in our previous decisions, supra. We can allot space for but a few of the more recent cases. Exhaustive citation would be impossible and unnecessary. *Oppenheim* v. *City of Florence,* 229 Ala. 50, 155 So. 859; *Jernigan* v. *Harris,* 187 Ark. 705, 62 S. W. 2d 5; *Reconstruction Finance Corporation* v. *City of Richmond,* 249 Ky. 787, 61 S. W. 2d 631; *Security Trust Co.* v. *City of Paris,* 264 Ky. 846, 95 S. W. 2d 781; *Young* v. *City of Ann Arbor,* 267 Mich. 241, 255 N. W. 579; *Farmers' State Bank* v. *Conrad,* 100 Mont. 415, 47 P. 2d 853; *Kirby* v. *Omaha Bridge Comm.,* 127 Neb. 382, 255 N. W. 776; *Pathe* v. *Donaldson,* 29 Ohio App. 171, 163 N. E. 204; *Tranter* v. *Allegheny County Authority,* 316 Pa. 65, 173 A. 289; *Cathcart* v. *City of Columbia,* 170 S. C. 362, 170 S. E. 435; *City of Houston* v. *Allred,* 123 Tex. 334, 71 S. W. 2d 251; *Casto* v. *Town of Ripley,* 114 W. Va. 668, 173 S. E. 886; *Arnold* v. *Bond,* 47 Wyo. 236, 34 P. 2d 28; *Shainwald* v. *City of Portland,* 153 Or. 167, 55 P. 2d 1151; *Department of Water and Power of Los Angeles* v. *Vroman,* 218 Cal. 206, 22 P. 2d 698; *State* v. *Connelly,* 39 N. M. 312, 46 P. 2d 1097, 100 A. L. R. 878; *Thomas* v. *McHugh,* 65 N. D. 149, 256 N. W. 763.

The steady growth in recent years of the practice of financing by this method the purchase or construction of public utilities by cities and towns, as denoted by increasing and now general recognition and approval of the special fund doctrine by the courts, affords persuasive, indeed convincing, evidence of its soundness and utility. As such, it is peculiarly in the public interest. Because of the fact that most cities and towns are so largely indebted that they cannot acquire and pay for expensive utilities out of their general revenues, or by bonds within their constitutional limits of debt, the special fund rule offers the only means of relief from helpless dependence upon an exclusive private market.

Their situation is comparable to that of a tenant who, after paying rent for the use of a hired house for many years, awakes to the realization that he has already paid enough money to his landlord to have bought and paid for a home of his own. So he moves into another house under a contract of purchase by which his monthly payments, no larger than before, gradually liquidate principal and interest of his purchase price and his payments cease. That is, the house has paid for itself.

How far the principle of this familiar transaction may be feasibly extended into the public utility field of cities and towns is rather a legislative question, embracing as it does complicated questions of engineering, finance, consumption, costs, earning capacity, etc. These matters are within the province of the municipal authorities, acting within the scope of their lawful powers. The governing bodies of cities and towns are the sole judges as to the wisdom, policy, and expediency of acquiring and operating public works. Courts do not interfere except in cases of clear excess or abuse of their lawful powers and authority. *Kentucky Utilities Company* v. *City of Paris*, 256 Ky. 226, 75 S. W. 2d 1082; *Butler* v. *Karb*, 96 Ohio St. 472, 117 N. E. 953; *Tranter* v. *Allegheny County Authority*, 316 Pa. 65, 173 A. 289.

Nor can we speak to the broader question of Public Ownership versus Private Ownership debated in the briefs in this case. That case is pending before a tribunal of more extensive powers than any that we possess—the Court of Public Opinion. Wherever men meet, in their homes, their clubs, on the streets, in the press, on the air, on the platform, in legislative halls, at the polls, the issue is being fought out to a decision. The major battles are yet to come. Should the verdict finally be for public ownership, we have no doubt that a body of public law will be worked out tending to ease the transition from one form of control to the other. But we cannot await the outcome. We must apply the law as we find it today to the record in each case in its turn.

It is a primary teaching that every complaint must disclose acts or conduct of a defendant that injure or threaten the rights of the plaintiff. The plaintiff here by its petition appears to sue in a dual role: (1) As a taxpayer having a common interest with all other taxpayers in resisting an unlawful disbursement, actual or threatened, of city revenues; and (2) as the owner of an existing utility and going business which is threatened with injury by competition of the proposed new municipal utility. In so far as its rights as a taxpayer are concerned, we have held that city revenues and tax moneys are not endangered or liable for the cost of a utility under the plan here proposed—hence plaintiff cannot be injured thereby. In such case, defendants contend that plaintiffs have no standing in court to raise even the constitutional question urged in this case, and that such question can only be raised by one who has an interest or rights that will be injured by the action taken or threatened. To that effect appear to be their cited cases of *Greenwood County* v. *Duke Power Co.*, 4 Cir., 81 F. 2d 986; *Hoyt* v. *Trustees*, 96 Colo. 442, 44 P. 2d 513; *Hazelwood* v. *City of Cooper*, Tex. Civ. App., 87 S. W. 2d 776; *Northwestern Light & Power Co.* v. *Town of Milford*, 8 Cir., 82 F. 2d 45; *Fellows* v. *Walker*, C. C., 39 F. 651; *Schumacher* v. *Klitzing*, 269 Ill. App. 60; *Id.*, 353 Ill. 530, 187 N. E. 458.

Plaintiff, on the other hand, contends upon the basis of our previous decisions that a taxpayer may maintain such an action to question the legality or constitutionality of indebtedness or bonds, as in this case.

True, we have heretofore entertained like actions by taxpayers. But the time should come when all questions being fully settled by the decisions of this court, a taxpayer can no longer state a case upon the contrary theory. If the question here be treated as still an open one, the inquiry would naturally be how and to what extent plaintiff's rights as a taxpayer are injured or threatened. It alleges that it pays annually a property tax of about $32,000, a franchise tax of $2,500, and under its franchise it furnishes free electric

service to the city of between $8,000 and $9,000—or a total tax and franchise burden of about $43,000 annually. If we suppose that this outlay is a total and permanent loss to plaintiff (not alleged), it would follow that once every nineteen years or so its entire capital of about $800,000 assessed valuation would be dissipated and lost—a serious matter. But, if we assume that the plaintiff, in keeping with common business practice, adds its tax and franchise burdens to its expense account for operation and maintenance, and then charges enough for electric current to reimburse its operating costs plus a fair return upon its invested capital, it would then seem to follow that plaintiff suffers no real injury because of its tax and franchise burdens. At least, it is not in the same case with other taxpayers who have no public utility, and who cannot first collect from the public in rates and charges the money it presently returns to the public in payment of taxes. Plaintiff's fellow taxpayers in Ogden might even gain where plaintiff loses by the threatened competition of a municipal light and power plant. And plaintiff's own interest as a taxpayer are submerged in its more substantial interests as the owner of a light and power plant that is threatened with loss from a competing plant which its fellow taxpayers are proposing to acquire and operate.

The issue seems to narrow itself, therefore, to the alternative role in which the petition purports to assert injury to plaintiff's rights, namely, as the owner of an existing plant and a going business in the manufacture, distribution, and sale of electric current to defendant city and its inhabitants, threatened with competition from the proposed new municipal plant. In this respect, also, the petition appears to be broader than the possibilities of relief under the law. It is not contended by plaintiff that defendant city lacks statutory power or authority to acquire and operate a municipal light and power plant, even though it result in injury and loss to plaintiff's business. That power has long existed under Comp. Laws Utah 1917, § 570x14; R. S. Utah 1933, 15-

8-14. It is not claimed that plaintiff's franchise from defendant city is an exclusive one. If it were an exclusive franchise, the grounds of the relief sought would undoubtedly have been laid on that theory in its petition. It was accepted by plaintiff, and all its investments made, with full knowledge that the defendant city might at any time do that which it now proposes to do. We are persuaded, upon this record, that it is the threat of competition to plaintiff's business by the proposed plant that has produced this lawsuit. That appears to be the bone of contention, the "hub" of the controversy, notwithstanding that the major burden of the arguments is hung upon other pegs in the briefs. We will, however, proceed to the consideration of the several specific objections inasmuch as another and similar action is pending in this court by the same plaintiff against another defendant —Provo City and its board of commissioners—involving somewhat similar questions. It is desirable that the law be finally settled upon all questions raised in the two cases.

It is objected that by the provisions of article III, paragraph 3, of the contract, and by section 7-B of the ordinance, the city will be obliged to meet any deficiency of revenues from the operation of the proposed plant with tax moneys or other general revenues of the city. We hold that the contract and ordinance provisions have no such meaning or effect. Similar contentions were made upon contract provisions not exactly but substantially the same in the Barnes, Fjeldsted and Wadsworth Cases, supra, and in *Utah Power & Light Co.* v. *Provo City, Utah,* 74 P. 2d 1191, and held untenable. To like effect, see *Farmers' State Bank* v. *Conrad,* 100 Mont. 415, 47 P. 2d 853; *Williams* v. *City of Raceland,* 245 Ky. 212, 53 S. W. 2d 370, 374; *Francis* v. *City of Bowling Green,* 259 Ky. 525, 82 S. W. 2d 804.

The same objection is made concerning another paragraph of the contract—that requiring defendant city to offer plaintiff $700,000 in purchase of its distribution system in Ogden before proceeding to construct a new one—namely,

that it creates or authorizes creation of a general obligation of the city. The contract provision in article V, paragraph 5, in question, was for the making of such an offer "as soon as the revenue bonds can be legally issued and placed in escrow," thereby making provision for such payment out of the proceeds of the bonds. However, we are not required to pass upon this objection because it appears by the return to the writ sent up by the city recorder that such an offer has already been made and refused by plaintiff.

It is objected that the recitals in the ordinance, contract, and bonds, that the city is owner of the property, free and clear of encumbrances or liens except the revenue bonds, are deceptive and untrue, will mislead purchasers of the bonds, and estop the city to deny its general liability. This objection is overruled as incompatible with the wording of the documents themselves.

The objections made by plaintiff and the intervener that the plans and specifications for the proposed plant are insufficient on their face to make a binding contract between the city and the contractor are overruled as not well taken, especially in view of the amendments made to the contract and specifications in the supplemental agreement coupled with the amending Ordinance No. 49. Limits of an opinion do not permit further amplification of this item.

The agreement of the city to operate the plant in an efficient manner is not open to the objection urged and creates no liability against general funds of the city.

The objection that the city may in future feed the special fund from general revenues of the city, and is not by the contract prevented from doing so, is untenable. It will be sufficient to consider such a situation when it arises.

The objections that the city did not before entering into the contract advertise for bids or budget the outlay in its annual budget do not lie in the case of a proceeding under the special fund doctrine where resort may

be had only to revenues of the proposed plant and not to general revenues of the City.

The provision in the contract for payment of the cost of insurance as part of the operating costs, the insurance money in case of loss to be used to replace property lost or damaged, is unobjectionable under our decision in *Fjeldsted* v. *Ogden City,* supra. The amount of the insurance and the insuring companies must be satisfactory to the contractor's finance agents, but the city incurs no general liability.

The objection made to the provision for escrowing the revenue bonds is not open to the objection made. The supplemental contract obviates it so that no just criticism remains. Likewise, the objection that bonds may be withdrawn from escrow before the contractor has filed his surety bonds and guaranties as required by the contract. Under the provision of the supplementary agreement this is no longer possible, if it was before.

Nor is there any provision in the contract or ordinance for the investment of tax moneys or other general revenues in the making of additions, extensions, or betterments of the plant in the future; but express provision is made therefor to be paid out of the earnings of the proposed plant, as we have seen. A mere conjecture as to what might be done by the city commissioners in the future is no substitute for present available grounds of objection.

There is no objection to the contract provisions for building up a working capital of $50,000 or a reserve fund of $200,000 out of revenues and earnings of the proposed plant. These impose no burdens upon taxpayers or general revenues of the city. These provisions are wise, in the public interest, harm no one, and guard against the contingency of a temporary deficiency in revenues.

To the contention that the city's receipt of the property will estop and prevent it from denying its general liability

to pay the revenue bonds independently of the special fund derived from the net earnings, it is sufficient to point to the repeated specific recitals to the contrary in the bonds, contract, and ordinance.

It is however, finally urged that there is no specific statutory authority for the issuance of special revenue bonds limited to the earnings of the proposed plant as the means or source of payment, except the provision made in the so-called Granger Act of 1933, Second Special Session 1933, Chap. 22, as amended by chapter 74 of Laws of Utah 1935, which must be but was not complied with. This objection requires somewhat more extended examination in view of our previous division of opinion on the subject. We are, however, after mature consideration, satisfied that this objection is not well taken. The Granger Act was an emergency measure, remedial in character, designed to meet a specific and pressing need. It was enacted at an extraordinary session of the Legislature assembled on call of the Governor. What was the emergency and the need for legislation? The answer is important because a remedial act must be construed with reference to the antecedent mischief with a view to apply and promote the remedy.

Before pointing out the need and the remedy, let us first inquire whether the practice of issuing revenue bonds payable out of net revenues was within either the mischief or the remedy intended by the Granger Act. There was previously no lack of statutory authority for such bonds. Our decision in *Barnes* v. *Lehi City,* supra, recognizing the validity of the special fund doctrine, was handed down on April 23, 1929. The Legislatures of 1931 and 1933 came and went without any manifestation of disapproval of the consequences of that decision under which doubtless many cities and towns were proceeding or preparing to proceed. Hard upon the adjournment of the 1933 legislature, on March 23, 1933, our decision in *Fjeldsted* v. *Ogden City,* 83 Utah 278, 28 P. 2d 144, was handed down, recognizing a modification of the rule in Barnes v. Lehi City. That is, that the rev-

enues of an existing public utility cannot be combined with the revenues from an enlargement, extension, or improvement thereof in creating the special fund which is to pay the cost of the latter without creating a general indebtedness of the city within the limitations of sections 3 and 4, article 14, of the State Constitution. One of the questions specifically raised on the hearing of the Fjeldsted Case was as to the power of cities to issue special revenue bonds limited for payment to recourse against the special revenue funds from the earnings of the proposed improvement. It was urged that a municipality has neither express statutory nor implied power in such case to issue or authorize the issuance of self-liquidating bonds. The contention was overruled and Mr. Justice Folland, speaking for the court, held that such power and authority existed under the general provisions of Comp. Laws Utah 1917, § 578, now section 15-7-2, R. S. Utah 1933. Section 15-7-2, R. S. 1933, reads:

"Powers to be Exercised by Ordinance. "When by this title power is conferred upon the board of commissioners, city council or board of trustees to do and perform any act or thing and the manner of exercising the same is not specifically pointed out, the board of commissioners, city council or board of trustees may provide by ordinance the manner and details necessary for the full exercise of such powers."

Here was specific recognition by this court of the power of municipalities to issue special revenue bonds payable out of the earnings of a proposed utility, in such form and manner as the governing body of a city might by ordinance determine, under a specific statute of this state. This decision was too recent at the time the Legislature convened in Special Session on July 10, 1933, for any abuses to have crept in during the interval. The fact is that the Fjeldsted decision had not yet become final or effective during the Special Session in question due to the fact that a petition for a rehearing had been filed in due time and remained pending and undetermined until December 14, 1933, after the Legislature adjourned. Hence, there was no emergency, no crying need for a remedy for a situation which might never

develop, as to the "manner of issuing bonds," calling for a remedy by the Granger Act. The very gist of the special fund doctrine of the Barnes and Fjeldsted Cases was that no danger to taxpayers existed from the issuance of such bonds or indebtedness since tax moneys or other general revenues of a city could not be resorted to for payment. What, then, was the evil or the need for the remedy provided by the Granger Act? There is nothing in the Granger Act itself to indicate that the Legislature recognized such an evil or sought to legislate against it. At that time the statute, Comp. Laws Utah 1917, § 578, had long been in force. This court's recognition and approval of what was done under that section in the Fjeldsted Case created no emergency if we may judge by what the legislature did about it in the Granger Act. If it had desired to neutralize what this court said about it in the Fjeldsted Case, it would have been easy for it to have used prohibitory words stopping such practice either absolutely, or save in compliance with the provisions of the act. And it would likely have made the prohibition permanent instead of merely suspending it for the period of two years, or less, as it did do. It did neither, as witness sections 2 and 23 of the act, viz.:

"Section 2. This act shall be construed as a cumulative statutory authority for the purposes herein named and shall not be construed to repeal any existing laws with respect thereto, it being the purpose and intent of this act to create an additional and alternate statutory method for the purposes herein named."

"Section 23. This act shall cease to be in effect, except to complete projects theretofore entered into under the provisions hereof, at the expiration of two years after the date of its enactment, or sooner if the Governor shall by proclamation or the Legislature shall by joint resolution declare that the emergency recognized by Section 1 of Senate Bill No. 10 of the second special Session 1933, has ended."

If not revenue bonds, or the manner of their issuance, what then was the evil, the emergency, and the remedy sought to be provided by the Granger Act? Section 23 provides the answer. Senate Bill No. 10 therein mentioned is chapter 21 of the Second Special Session Laws of 1933 (im-

mediately preceding the Granger Act, which is chapter 22). Section 1 of that act reads:

"A National and State emergency productive of widespread unemployment and disorganization of industry which burdens interstate and intrastate commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. * * *"

The section then recites the policy of the Legislature to remove obstructions to commerce tending to diminish the amount thereof, and to provide for the general welfare by legislation in eight different directions or classifications. To effectuate the policy of the act, the Governor is, by section 2 of the act, authorized to appoint the State Industrial Recovery Board and to prescribe their duties and responsibilities, etc. Other sections provide for codes of fair competition, trade agreements, hours, wages, and working conditions, exemptions from antitrust laws, etc., rules and regulations, fees, etc. Thereupon, in further pursuance of its declared policy with respect to the recognized emergency, the Legislature proceeded by its next chapter (chapter 22, the Granger Act) to provide, by section 1, that any county, town, or city in Utah may purchase or construct any one of many enumerated public utility works, including "electric plants and/or distribution systems," and numerous others—

"* * * and including any public works or improvements named in the National Industrial Recovery Act, as an object upon which the moneys appropriated under said act may be expended or loaned, either within or without the limits of such county, city or incorporated town now or hereafter owning and operating any such project or service may improve, enlarge, extend or repair the same, as in this act provided."

Section 2 of the act makes the procedure under it nonexclusive and cumulative, as we have seen, it being the recited intent of the act to provide an additional and alternate statutory method of procedure.

Section 3 of the act is lengthy, so cannot be copied here. It outlines a course of procedure by which cities and towns may proceed in cooperation with the National Industrial

Recovery Act to obtain the contributions and benefits provided by that act from the Federal Treasury. So far as procedure is concerned as regards the issuance of bonds, it substantially copies the procedure before recognized as valid under the special fund doctrine by this court, save that it adds the provision that the bonds when issued may be sold at public or private sale, and except when sold or disposed of to the United States or some agency thereof created by Congress, such bonds shall be sold only after ten days notice by advertisement in a newspaper. And contracts for construction also are to be let after public newspaper advertisement. In these particulars as in other matters of detail, the act recognizes no prior evil or emergency to be met, but prescribes merely the procedure to be followed when a city or town elects to pursue the "additional and alternate statutory method" denoted by section 2 of the act.

By section 14 of the act, however, the Legislature did take cognizance of the decision of this court in the Fjeldsted Case by providing that whenever cities or towns owning a project or service described in section 1 of the act shall desire to construct improvements or betterments thereto, they may issue revenue bonds under the act to pay for the same, under the same procedure as before prescribed in section 3 of the act; provided, the governing body of the city or town may provide, find, and declare, in addition to the other requirements set out in this act, the value of the then existing project or service and the value of the betterments or improvements proposed to be constructed, and that the revenue derived from the entire project when the betterments and improvements shall be constructed shall then be divided according to such values, and so much only of the total revenues as is in proportion to the added value of the improvements and betterments as against the value of the existing project or service as so determined may then be set aside and used to pay for the improvements and betterments, provide a sinking fund and reserve, etc., for paying off bonds issued against the cost of the improvements and betterments.

These provisions of section 14 of the Granger Act were a manifest recognition of the limitation placed by this court upon the special fund doctrine in its decision in the Fjeldsted Case, and an attempt to authorize a plan of procedure that would comply with it in cases where cities or towns might desire to extend or improve an existing utility owned by it without pledging any revenues from the existing utility. There was no evil or emergency growing out of this court's decision in the Fjeldsted Case that the Legislature attempted to remedy nor any dissatisfaction with the rule itself as declared in that case, but there was a manifest attempt by the Legislature to formulate a procedure by which towns and cities might comply with the rule and still obtain the benefits of the special fund doctrine. All else in the act was mere detail of procedure authorized for those cities or towns that might elect to proceed under the act to obtain the privileges and benefits offered thereby in cooperation with the National Industrial Recovery Act, 48 Stat. 195.

The emergency then, which was recognized by the Granger Act, and for which it sought to provide a remedy, was not the previously unregulated issuance of revenue bonds by towns and cities under the authority of Comp. Laws Utah 1917, § 578, R. S. 1933, 15-7-2, but the emergency of general public distress, lack of employment, paralysis of commerce, and devastation of American standards of life recognized by section 1 of chapter 21 of the same Second Special Session of 1933. This was also recognized by the Governor's call for the Special Session and his public address to the legislature upon its opening. And so by the emergency provision in section 23, c. 22, the act was limited to two years or less. The emergency was not then expected to last long. But in the next regular session in 1935, it was recognized that the emergency was still serious, and so by chapter 74 of the laws of that year the Granger Act was amended in three of its sections and the life of the act was extended until such

time in the future as the Governor or the Legislature shall publicly recognize that the emergency is at an end.

Again, we say that if the mischief and the remedy aimed at by the Legislature in the Granger Act had been merely that of the issuance by cities of revenue bonds in a manner unregulated otherwise than by said section 578, Comp. Laws 1917, and by city ordinance pursuant to the authority thereof, it would have prohibited the practice entirely and permanently, not merely during the national emergency or for a two-year period, because such a mischief would not die with the emergency. Nor would a remedy have been provided that would be cumulative merely and permit cities and towns to evade it at their pleasure by resorting to the optional alternative procedure authorized by statute prior to the Granger Act, and by the latter act expressly left in force.

Turning now to the petition in intervention of the General Contractors Association of Utah: By apt reference it has made the original petition of plaintiff its own, so in passing upon the questions raised by plaintiff we have substantially covered the contentions of the intervener. Aside from that, we are doubtful of the petitioner's standing as an interested party to question the proposed contract and ordinance, original or amended. Its petition alleges that it is a corporation under the laws of Utah, engaged in fostering and developing the general contracting business with a membership composed of individuals, firms and corporations, some of whom are taxpayers and property owners in Ogden, duly and regularly licensed as contractors to engage in the construction of public and private works and utilities, etc., and qualified to contract and compete for the construction of such works. It does not allege that petitioner itself is a taxpayer, licensed contractor, or a competitor in the construction of such works, or that it was prepared to make a bid to defendant city for the construction of the proposed electric plant upon the terms of payment prescribed in the contract or ordinance. The contrary conclusion is necessitated by its insistent contentions in its petition and

brief that the contract and ordinance in question are unlawful and void. Or is it the intervener's contention that the transaction would have been lawful had it bid for and obtained the contract but that the contract is unlawful when made with another? And this, quite aside from its own lack of status as a taxpayer or licensed contractor. The fact that some of its members have that status does not in itself impart such status to the plaintiff. Membership may denote a quasi-contractual relationship between a corporation and its members arising out of its articles and subscription for membership, much like that of stock ownership in other corporations. It does not denote identity but relationship. No facts are alleged in the petition imparting to plaintiff any enforcible right or interest in the business of its members.

Our conclusion is that the petitions of both the plaintiff and the intervener should be dismissed and the alternative writ of prohibition recalled, with costs to those defending. It is so ordered.

WOLFE, Justice (concurring).

I concur in the opinion of Mr. Justice HANSON. As stated in my opinion in the case of *Utah Power & Light Co.* v. *Provo City*, 94 Utah 203, 74 P. 2d 1191, I cannot agree with the idea advanced by Mr. Justice LARSON that the voters of a city can exercise by initiative or referendum any different powers than can be exercised by the city commission. By the initiative the people initiate municipal legislation, and by the referendum they refer it; but in both cases they must act within the powers given to the municipality by the legislature or by the people of the state at large, acting through the initiative. The falsity of that doctrine seems to me to be revealed in his present opinion under a situation where not the commission on its own initiative refers an ordinance, but where the reference is initiated by parties hostile to the ordinance. In the Provo Case where the commissioners themselves referred their own ordinance, it might be contended with plausibility that they made as

part of the very ordinance itself its validity dependent on the approval of the people. But in this case, the city commission intended to make an ordinance complete and valid at the time of its passage. I think the people, through the referendum, hold over the ordinance a veto power; but if they do not exercise that veto power but approve it, the force of the ordinance comes from the act of the commission and not from the vote of the people. The people approve or reject. They do not legislate. Certainly, where the Legislature passes an act put to referendum and approved, it cannot be said that the act obtains its force from the action of the people and not from the Legislature.

Therefore, I disagree that the ordinance "receives its life, its vitality, its effectiveness, not from the act of the City Commission but from the vote of the people."

LARSON, Justice (concurring in part, dissenting in part).

I concur in the holding of Mr. Justice HANSON that the alternative writs heretofore issued against defendants should be recalled and the petitions of both plaintiff and the intervener should be dismissed. Such action must necessarily follow since the petitions were filed prematurely, and the writs improvidently issued. It appears that after the ordinances set up in the petitions of plaintiff and intervener were passed and ordained by the city commission of defendant city, a petition for a referendum on the ordinance was filed and accepted by the city as sufficient in form, substance, and signers to refer the ordinance to a vote of the electorate of the city, and such referendum was ordered. Such was the situation at the time plaintiff brought this action and the writ issued. The filing of such petition for a referendum automatically stays the ordinance or any action under it. The ordinance does not take effect until approved by vote of the people, and for five days after the result of such vote has been proclaimed. If the ordinance is rejected by the electorate at the referendum, there is no ordi-

nance at all. It is the same as though the city commission had never passed, enacted, or ordained the ordinance. R. S. Utah 1933, 25-10-4, 25-10-5, 25-10-21, 25-10-23; Constitution of Utah, art. 6, § 1. There being no ordinance, no action could be taken or threatened under it, and the city could not be enjoined or prohibited from acting or taking any proceeding under it. One cannot be prohibited from acting or proceeding under that which is not. The only effect of the writ, therefore, was to prohibit the city from holding a referendum election, that is, to prohibit a legislative body (the people) from considering and acting upon a proposition, legislative in its nature, upon the ground that if they did they might enact some legislation that would be subject to constitutional objections. No one would seriously contend that the arm of the judiciary should be extended to prevent the legislative department from voting on a proposition on the ground that they might vote wrongly or unwisely. We may stay the hand of the executive branch in attempting to carry out or enforce a legislative edict on the ground that it contravenes the provisions of the Constitution, but we cannot stay the legislative department from enacting or ordaining the edict. It is only when the act is put into operation or effect, when its force, limitations, or restrictions are applied or attempted to be applied against the individual or the group, that the official hand may be stayed by judicial intervention. Had the referendum been held, the result might have been adverse to the ordinance and this lawsuit would never have been brought. And, since the writ must be recalled and the ordinance yet clear the hurdle of a referendum election, it may still develop that the points involved will become moot.

However, the defendants have joined with plaintiff and the intervener in asking us, now that the cause is here, to examine and pass upon the points raised in the petition and answer. The questions being of somewhat momentous and public concern as well as vital to the future conduct of the parties, we shall dispose of the issue presented.

I concur generally in what has been said by Mr. Justice HANSON relative to the special fund doctrine. It is too firmly established in this state now to be upset by judicial decree. Its wisdom is for the legislature, which determines questions of policy. Its constitutionality has been repeatedly upheld by this court.

As to the interpretation of the so-called Granger Act, chapter 22, Laws of Utah 1933, Second Special Session, I must again disagree with my associates. My views on the interpretation and effect of the Granger Act are stated in my opinion in *Utah Power & Light Co.* v. *Provo City*, 94 Utah 203, 74 P. 2d 1191, and need not be repeated in detail here. I there held that the Granger Act was a limitation upon the city officials, the "governing body of the city," for the protection of the city and its inhabitants against any rash or ill-considered undertaking, by a public corporation, of public utilities by issuing revenue bonds without the consideration and approval of the people in accordance with our democratic principles, history, and governmental concepts. In the Provo City Case I took the position that the ordinances there involved, being enacted or ordained by vote of the people under the initiative provisions of the Constitution and the statutes, were not invalid for failure to comply with the Granger Act, and as to such ordinances, the people having spoken thereon, the Granger Act had no application. In the instant case the ordinance and contract were not initiated ordinances, but were passed and ordained by the city commission acting as the "governing body of the city." It is frankly admitted that the city commission, the "governing body of the city," did not comply with the provisions of the Granger Act. Under such circumstances had the matter of the enactment of the ordinance stopped there, and this suit then been brought, plaintiff must have prevailed under the decision in *Utah Power & Light Co.* v. *Provo City*, supra, rendered since this action was commenced. But such is not the case. Before this action was instituted a proper and valid petition for a referendum was filed and accepted by the

city commission and a referendum ordered. Such proceeding suspended the operation of the ordinance. It prevented its taking effect, and it cannot now take effect or have any validity until such referendum vote has been taken and a majority of the voters at the election shall have voted for the ordinance. If the ordinance shall not carry at the referendum, that is the end of the matter—there is no ordinance. The whole effort is abortive and died aborning. If, however, a majority vote for the ordinance, it then becomes effective five days after the result of the vote is officially announced; and receives its life, its vitality, its effectiveness, not from the act of the city commission, but from the vote of the people, the arbiters, the final tribunal of policy, the source from whence all political power comes. Sections 25-10-4; 25-10-5; 25-10-21; 25-10-23, R. S. Utah 1933. Such being the case, it becomes an ordinance, approved by the vote of the people and effective in the same manner as an initiated ordinance and not within the provisions or limitations of the Granger Act.

I see no escape from such conclusion if we bear in mind the experiences out of which our government grew and the elemental principles upon which it is founded. This state, as well as the nation, was founded by a people rich in political experience, devoted to the ideal that all political power is inherent in the people, and with a strong and dominating faith in local self-government. The idea of a totalitarian state was never born or conceived in the minds of the pioneers who carved this empire out of desolation, nor of the sturdy men who framed the Constitution of the state. They declared in no uncertain terms that "all political power is inherent in the people," article 1, § 2, that "governments derive their powers from the consent of the governed," and that a frequent recurrence to these fundamental principles is essential to the perpetuity of free government. These declarations are not mere metaphors, sounding brass and tinkling cymbals pleasing to the ear, but a vital principal adhered to in the formation of the government of this state. The

founders of the state never conceived of setting up a super-creature, the state, which should devour its parents, the people, and be the ultimate to which the people were mere puppets. The people set up the state as their agent or servant through which they might for convenience express their sovereign will. They created the state; the state did not create the people. The people are the master and the state, the servant, founded upon the elemental principles by which their civilization had grown, and from which their political philosophy had evolved. To secure the political rights they had and preserve for their posterity the political ideals which had meant so much in their development, and to preserve which they had suffered, they framed the Constitution and set up for their convenience, and as their servant, a government, the state. The people are sovereign; the state is merely their instrument through which they exercise part of their sovereign will. Confusion results if we fail to distinguish between sovereignty itself and that force which stands as the representative of the sovereign power. The principle of local self-government is fundamental in American political institutions. It has been the seat of modern civilization, the nursery of public spirit, the center of constitutional liberty, and the fountain of patriotism. The right of self-government should be carefully guarded and every infraction or evasion thereof condemned.

While the sanctity of life should be given to every act of the legislative body which is not in contravention of superior statutes or of the Constitution, with clearer reason and with greater force should life be given to the act of the sovereign itself, the source of all governmental power, the vote of the people.

The intervener has argued at length that the ordinance and agreement with the contractor are void. As stated by Mr. Justice HANSON and as indicated by the writer in the Provo City Case, supra, the intervener is in no position to raise those questions, being neither a resident nor taxpayer of Ogden City, nor a person whose interests are adversely

affected by the provisions of the ordinance or the agreement. It may be added, however, that the question of rates to be charged and to be paid by the city for light and power services must, under the express provisions of the ordinance, be reasonable charges for the services rendered. We held in the Provo City Case that any attempt to charge the city, or bind the city to pay more for its power and light services than the *reasonable and just* value thereof, would be an effort to pay the revenue bonds from general or tax revenues of the city and void. While this ordinance is more definite than was the Provo City ordinance, the statement there made applies with equal force here. The other objections urged to the contract and ordinance were also urged in the Provo City Case and discussed at some length by the writer. In addition to the reasons stated by Mr. Justice HANSON in his opinion in this cause, the reasons stated in the Provo City Case apply to the objections, and they are accordingly held without merit.

After commencement of this action, defendant city commission amended the ordinance and agreement by consent of the contractor. It was stipulated that writs of prohibition and certiorari theretofore issued should apply to the amended ordinance and the record thereof is before us. A proper petition for a referendum on the amended ordinance was presented, accepted by the city, and a referendum to the voters ordered. I agree fully with Mr. Justice HANSON that no contempt was committed thereby, and under the holding of this court in *Keigley* v. *Bench,* 90 Utah 569, 63 P. 2d 262, any question except as to the amended ordinance, which must now go to referendum, is probably moot.

It follows that the order made by Mr. Justice HANSON recalling the writs, dismissing the action, and awarding contesting defendants their costs is proper. Let the order issue and judgment be entered accordingly.

FOLLAND, Chief Justice (concurring in part and dissenting in part).

· I concur in that part of the opinion of Mr. Justice HAN-SON which exonerates the city commission of Ogden City from any contempt of this court or of an intention to circumvent the process or order of this court in its amendment to the contract and ordinance while the cause was pending here. I also concur in that part of the opinion which makes clear that the holders of the revenue bonds in question, if and when issued, must look to the net revenues from the operation of the proposed system as the sole and only payment of such bonds, and that in no event will the city be legally or morally obligated for their payment.

Further, I believe the cities of the state may avail themselves of the special fund method of financing their lawful projects but must do so in accordance with and subject to the wholesome and salutary legislative provisions contained in chapter 22, Laws of Utah 1933, Second Special Session, commonly known as the Granger Act.

My principal disagreement with the decision of the court is in the holding that the city commission and the voters of Ogden City may entirely ignore the wise protective provisions which the Legislature has seen fit to enact in the Granger Act. In the case of *Utah Power & Light Co.* v. *Provo City*, 94 Utah 203, 74 P. 2d 1191, I concurred in the dissenting opinion of Mr. Justice MOFFAT and briefly expressed my own views, to which I still adhere. That case is pending on petition for a rehearing and the decision is not yet final. I therefore feel free to again voice my dissent to the decision of the majority and to further state my reasons.

. The language of the act as originally passed limited its operation to a definite time, but that provision has now been repealed. The act remains a statute of the state, in full force and effect. Undoubtedly it will remain so for a considerable time in the future. This statute provides a method by which cities and towns may finance themselves by the issuance of revenue bonds for the purpose of constructing any of the public projects, systems, or industries which the city or town may lawfully construct and operate.

It is the only statutory method of municipal financing under the special fund doctrine and in my opinion is binding on all cities and towns of the State, including Ogden City. In *Fjeldsted* v. *Ogden City*, 83 Utah 278, 28 P. 2d 144, the court referred to the lack of statutory authority to issue self-liquidating bonds, and we there said (page 153) :

"There is no mention anywhere in the statutes or constitution of conditional sale contracts or of self-liquidating bonds. The statute has conferred the power to purchase, lease, and construct waterworks or water supply systems, but has not, other than already indicated herein, specified the manner in which, or means by which, the municipality may accomplish its purposes within the powers conferred. It is competent for a municipality to accomplish such purposes in any lawful manner, and may itself by ordinance provide the manner and details necessary for the full exercise of such powers under the provisions of Comp. Laws Utah 1917, § 578, which is as follows: 'When by this title power is conferred upon the city council to do and perform any act or thing, and the manner of exercising the same is not specifically pointed out, the city council may provide by ordinance the manner and details necessary for the full exercise of such power.' "

Until the decision of *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, the so-called special fund doctrine was entirely unknown to the judicial decisions of this state. By that case and the later decisions of this court, the doctrine was recognized and approved, but even then there was no legislative method provided by which cities and towns could avail themselves of special fund financing.

In the Barnes Case there was no thought of issuing bonds of any sort. What was there approved was a conditional purchase by the city of a Diesel engine and equipment with title retained by the vendor, to be conveyed upon final payment. In the Fjeldsted Case, supra, self-liquidating bonds were proposed for the first time. In the absence of any statutory method this court held as above indicated that power was vested in the cities to provide by ordinance the manner and details for the exercise of such power. Section 15-7-2, R. S. 1933 (the same as section 578, Comp. Laws 1917), is a general statute not limited to the subject matter of financ-

ing. While a petition for rehearing in the Fjeldsted Case, supra, was pending undecided in this court, the Second Special Session of the Legislature in 1933 passed the Granger Act. I view quite differently the objects, purposes, and scope of this act than do my associates who join in the prevailing opinion. The Fjeldsted decision had not yet become final, but was under attack at various points by virtue of the pendency of the petition for a rehearing. There was reasonable ground for fear it might not become final. That decision recognized the right of Ogden City to issue special revenue bonds, but pointed out the dearth of legislative sanction of the special fund doctrine or the issuance of self-liquidating bonds. It suggested the need for segregation of revenue earned by city-owned property from revenue earned by the use of new property to be acquired and to be used in connection therewith. We said the special fund out of which self-liquidating bonds could be paid must be revenue from the new system or new portion of the system. If the court's opinion had become final, any city, exercising the power granted by section 15-7-2, R. S. 1933, could have provided adequately for the issuance of bonds, construction of the project, and proper segregation of the revenue. Any city, by ordinance, had as much power to provide for the latter as for the former under section 15-7-2. The federal government at the time was encouraging the use of the special fund method of financing local improvements in the interests of increasing the employment of men, and Ogden City had made arrangements to obtain its funds from a federal agency.

Not one, but a number of purposes, were accomplished by the passage of the Granger Act. Here for the first time was legislative recognition and approval of the special fund doctrine and the enactment of a method by which cities could be financed under it. The act provided that municipalities might issue revenue bonds and placed limitations upon the issuance thereof. Reasonable and proper safeguards were written into the law whereby the citizens and taxpayers of

the various cities, towns, and counties could be protected against unwise and improvident action on the part of their public servants. Provision was made for financing by or through the federal government under the National Industrial Recovery Act, 48 Stat. 195, but revenue bond financing was not limited to that. Provisions were adopted similar to those already existing with respect to issuance by municipalities of general obligation bonds, and the construction of public works payable out of the general fund. Revenue bonds issued or sold to any person other than the federal government or some agency thereof could be sold only after advertisement and upon bids. The rate of interest, the maximum period of such bonds, and provisions for refunding such bonds were specified. A two-thirds vote of the governing body of the municipality was required for authorization. Construction contracts, if in excess of $5,000, were authorized to be let only after due advertisement and competitive bidding. These provisions were applicable in all cases and not restricted merely to projects financed by or through the government. Instead of leaving it to each individual city or town to provide by ordinance the manner or method by which each could finance new projects under the special fund doctrine, this act provided a uniform method for all cities, towns, and counties in the state. The safeguards and limitations imposed by the Legislature were in furtherance of a wise public policy.

The powers of cities and towns referred to in section 15-7-2, R. S. 1933, may be exercised only when such power exists but "the manner of exercising the same is not specifically pointed out." By the Granger Act the manner of exercising the power of cities, towns, and counties to acquire public projects under the special fund doctrine is "specifically pointed out."

It would be indeed strange if the Legislature, after carefully restricting the manner and method of issuing general obligation bonds and providing the same type of restrictions

and limitations when revenue bonds are issued to the federal government, should leave it entirely optional with local authorities to finance its projects by contracting with private capital, entirely free from any statutory provision whatever. They would then be at liberty to make contracts for construction of projects and for sale of bonds without limitation as to rate of interest, price to be obtained, and without advertisement or competitive bidding. I cannot believe the Granger Act was intended merely to afford federal aid to municipalities in view of the National Industrial Recovery Act. The Granger Act is broader in scope than that, yet this court by the prevailing opinion now holds municipalities may ignore it completely whenever they choose to do so.

As I read the opinion of my associates, the act can serve no other purposes when the opportunity for federal aid has passed, than if it were an article published in the newspapers offering its suggestions as a convenient method of financing which cities and towns could follow if they chose. The powers granted in section 15-7-2, R. S. 1933, are not such as can be exercised by cities at their *option,* but only when there is no legislative *method* prescribed. Section 2 of the Granger Act does not use language from which one can infer the act was intended for use only when any local governing body should choose to do so. The language used is that it is intended to create an "additional and alternate *statutory method.*" *The act is itself a statutory method which* must have force and effect and is the only method provided by statute for issuance of special revenue or self-liquidating bonds. Section 3, as well as other provisions, of the Granger Act indicates that it was intended to cover more than financing by moneys obtained from the federal government or any of its agencies, notwithstanding the reference to the National Industrial Recovery Act. In other words, the act is much broader in its scope than merely to provide a method by which the local units of the state could finance themselves through federal aid. The language is broad enough

to include, and I think it does include, all financing within the special fund doctrine.

I cannot agree with the views of Mr. Justice LARSON expressed in his concurring opinion to the effect that a still-born ordinance passed by a city commission obtains vitality and life from a referendum, if and when the people approve it. This, to me, is strange doctrine. It has no basis in any statute or in any judicial decision. The referendum statute contemplates a valid ordinance obtaining vitality from its enactment and effective at the date fixed therein, unless a referendum petition be filed. In the event such petition is filed, the effective date is delayed until such time as the ordinance is approved by the voters. If defeated, it never goes into effect. Section 25-10-5, R. S. 1933. The ordinance before us was enacted by the board of commissioners, and it is either valid or not by virtue of the provisions it contains. If within the power of the commission to enact it, it is valid; if not, it is void. I know of no means by which an ordinance, void ab initio, may be resuscitated and given effect by vote of the people. In my view, the ordinance was void as passed because it did not comply with the statutory requirements.

The writ heretofore issued by this court should be made permanent.

MOFFAT, Justice.

I concur in the dissenting opinion of Mr. Chief Justice FOLLAND.