INTERSTATE POWER COMPANY, Plaintiff, Appellant, v. TOWN OF McGREGOR et al., Appellees; ALICE SEYBERT et al., Intervenors, Appellants.

No. 45487.

Smith & O'Connor, D. D. Murphy & Son, and Robert Coon, for appellants.

Cor Van de Steeg and Stipp, Perry, Bannister & Starzinger, for appellees.

Bliss, J.—The determining elements of the appeal are largely factual. Referring to the matters somewhat in chronological sequence, it appears that the plaintiff has been furnishing electric energy to the users thereof in the defendant Town for some years under a franchise. On its expiration, the voters refused to renew the franchise, but the service has been maintained. In the fall of 1939 the defendants, by resolution, submitted to the voters of the Town a proposal that the Town establish and operate its own electric light or power system, to cost not to exceed $120,000, and to be paid solely and only out of the earnings thereof, without incurring any indebtedness therefor by the Town. At the special election on October 12, 1939, the proposal carried by a vote of 400 to 275. During the campaign preceding the election, there was considerable activity on the platform, in the press, and by general comment, both for and against the proposal. There may have been some street talk that the adoption of the measure might be used to drive a better bargain with the power company, but there is nothing in the record to warrant any claim that the election was not fair and lawful in every respect. Keokuk Waterworks Co. v. Keokuk, 224 Iowa 718, 734, 277 N. W. 291; Abbott v. Iowa City, 224 Iowa 698, 715,

277 N. W. 437. On February 9, 1939, the voters had defeated a proposition to give a franchise to the plaintiff, and on January 15, 1941, at an election commanded by a writ of mandamus procured by the plaintiff, the voters again refused the franchise, by a majority of 157 votes.

After the election on October 12, 1939, there were some negotiations between the plaintiff and defendants with respect to a lease or sale of plaintiff's plant, or for the wholesale of electric energy to the Town, but no agreement was reached. On November 3, 1939, defendants employed Mr. Van de Steeg to advise and assist them in any legal matters. On the same day, the defendants, by written contract, employed the Stanley Engineering Company, of Muscatine, Iowa, to prepare plans and specifications for the proposed improvement, and to have general supervision of its construction. A suit in equity attacking the validity of this contract was instituted by Walter Davies, one of the objectors hereinafter referred to.

The plans and specifications and form of contract were submitted by the engineer to the defendants, and filed in the office of the town clerk on March 1, 1940. The improvement was one contemplated within the provisions of the 1939 Code, sections 6134.01 to 6134.11, known as the Simmer Law. As provided by sections 6134.08, 6134.09 and 6134.10, the defendants published notice of a hearing for 10 o'clock in the forenoon of April 10, 1940, upon the plans and specifications and proposed form of contract, and any objections thereto, and for bids, and the entering into of such contracts as the town council "shall deem to be to the best interest of the municipality." The notice was published on March 7 and 14, 1940. The plaintiff, alone, on April 4, 1940, filed its petition in court, praying for an injunction against the entering into of any such contract, upon the alleged grounds that there was a failure to provide for competitive bidding, in that (1) the contract was to be let on the basis of labor and materials combined, and not separately; (2) it provided for payment on completion of the work in cash to be derived from the sale of revenue bonds issued under the Simmer Law, which are not general obligation bonds of the municipality payable by taxation, but solely by revenue from the plant, and to be a lien upon the improvement; (3) there was no provision obligating the munici-

pality to sell the bonds at any particular time or place; (4) only those could, bid who were able to purchase the bonds or accept them in lieu of cash because there was no general market for such bonds at par, at which they must be sold; and (5), if the municipality failed to sell the bonds for sufficient to pay the contractor, the municipality and all the taxpayers would be liable in damages for breach of contract.

A hearing was had on the petition on the day it was filed, at which it was stipulated by the parties that the defendants might perform all acts provided for in the published notice except that they should not sign, execute, or enter into any contract for the improvement, until the ruling of the court. No such contract was executed until after the decree, and on October 3, 1940.

The published notice, and the instructions to bidders, provided that: The maximum expenditure would be $120,000; the work would be in four sections, to wit, section 1—construction of power plant building, etc.; section 2—installation of two Diesel engines with a combined horsepower capacity of not less than 650, nor more than 750, complete with electric generators, accessories, etc., and neither engine of less horsepower capacity than 300; section 3—installation of electrical equipment within power plant consisting of switchboard, bus structure and all cable and wiring; section 4—construction of distribution system; bidders might submit a bid on any or all of the sections, or a combined bid on all of the work; payment for the improvement to be made in cash, only out of the proceeds of the sale of electric revenue bonds bearing annual interest not exceeding 4 percent, payable solely out of net earnings of the plant, and without any obligation or liability on the part of the Town, by taxation or otherwise, by reason of the insufficiency of the net earnings; the council reserved the right to reject any and all bids and to enter into any contract deemed for the best interests of the Town. Under the notice, instructions to bidders, plans or specifications, no particular make of Diesel engines, generators or other equipment was specified.

The hearing was had at the time and place specified. Typewritten objections consisting of an original and several carbon copies were filed with the town clerk on this date. The recited objections were (1) the plans and specifications provided that

the lettings were made on a basis of materials and labor and failed to provide for competitive bidding; (2) the contract provided that payments were to be made out of revenue bonds which did not constitute a lien on any taxes of the Town and were solely dependent on the physical capacity of the plant and its earning power for their payment; (3) no provision was made for the sale of the bonds prior to the letting, and since they must not be sold for less than par, the contractor might be forced to sue the Town for breach of contract, or to accept the bonds in payment of the contract, which was an inhibition against free and competitive bidding; (4) that the contract with the engineering company provided for its payment out of revenue bonds, but if not, then out of the general fund of the Town, thereby making the Town and its property liable for an excessive taxation which otherwise might not be. Seventy-three persons, all on April 9 and 10, 1940, signed these objections. Three of these signers also signed an objection stating that the letting of the contract would create an indebtedness against the Town in excess of the constitutional limitation. The objections were presented on behalf of the objectors by one of the attorneys for the plaintiff. The minutes of the meeting further show that a number of business men addressed the council and asked that it proceed with the approval of the plans and specifications, and the opening of the bids; that there were about 75 bidders and materialmen present and several of them stated that they had examined the plans and specifications and form of contract and had found them to be very fair and to present a wide range of bidding; the mayor called for other objections but none were made; representatives of two bond buyers were present and stated to the council that they had already made a bid for the bonds on the basis of $3\frac{1}{4}$ percent, and were ready to enter into a contract to purchase the bonds on that basis; some of the bidders offered to accept bonds on the same basis in payment of their contracts if they were successful bidders. A resolution was then passed adopting the plans and specifications.

The sealed bids were then opened and, with the exception of one which was not signed, were read. There were thirty-one bidders in all, not including the one whose bid was not signed. Nine of them submitted bids on section one, either separately or

combined with another section, or sections. These bids ranged from a low of $15,987 to the high bid of $20,994. There were six bidders on section two. Four of these submitted two bids. These bids ranged from $42,142 to $50,372. On section three there were nine bidders, not including two others who bid on the section in combined bids. The bids of the nine ranged from $9,146 to $14,-158. Fourteen bid, either separately or in combination with other sections, on section four. Their bids ranged from $28,878 to $39,-748.03.

There were four bids on the combined sections as a whole. Of these, Fairbanks, Morse & Company submitted two bids. One of them, based on one Diesel engine of 300 horsepower and one of 375 horsepower, was for $103,952. Its other bid, based on two Diesel engines of 375 horsepower each, was for $106,490.

The combined group bid of the L. A. Kepp Construction Company was $104,600. The combined group bid on the four sections submitted by the Electric Equipment Company was $105,334. There were other combination bids on a less number of sections.

After reading the bids, the meeting then adjourned until 7 o'clock that evening, at which time a resolution was adopted overruling and finding without merit all objections filed or offered. The mayor and council, and their attorney, and the engineer then retired into a private, executive session for a discussion of the different bids, bidders, and the equipment of various kinds included in the proposals of the bidders. The engineer analyzed the bids, and reported to and advised the town officers with respect to these various matters. This conference continued until about midnight. They called in the representatives of the bidders who appeared to be most likely successful and gave each of them an opportunity to appear before the council. After further discussion and deliberation, they reconvened in open session. No formal action was taken at the private conference. After reconvening, a resolution was adopted accepting the proposal of the Electric Equipment Company, covering all four sections, in the amount of $105,334, as the bid deemed for the best interest of the Town. All minutes of the meeting were then read and approved and the meeting adjourned.

On April 24, 1940, 103 persons, residents, citizens and tax-

payers of the Town, filed a petition of intervention, through the same attorneys appearing for the plaintiff, adopting the allegations of its petition. The petition also alleged that the election was in the nature of a bargaining power to secure better terms for a renewal of the power company's franchise. They also alleged that the Town officers conspired with the successful bidder to eliminate competitive bidding, and to secure an unlawful award. Various amendments to their petitions were filed by plaintiff and intervenors, alleging that no consideration was given to the objections; that the hearing was a sham and a fraud; that the unsigned bid was wrongfully discarded; that the execution of the contract would exceed the constitutional debt limit of the Town. The substituted answer of defendants, applying to the petitions and amendments thereto of plaintiff and intervenors, is substantially a general denial.

I. The first proposition argued by appellants is that the failure to invite bids upon labor, as distinct from materials, was a limitation upon competitive bidding, in its broadest scope. One witness testified for appellants in support of the proposition. There was testimony to the contrary and to the effect that such a method would be impracticable, in that it would be difficult to coordinate the work, and to properly and economically supervise the various kinds of work required, the greater part of which called for skilled labor. The matter is one which must be left very largely to the sound discretion of the municipal officers and their engineer. Appellants have not sustained the proposition.

II. Appellants urge that the plans and specifications and form of contract should have been discussed and adopted at one hearing, and that the reception of bids and the selection of the successful bidder and the execution of the contract should have been deferred until a later hearing. We are not called upon to discuss or to determine the propriety or the wisdom of the suggested procedure. The legislature in Code section 6134.10 has specifically provided that the governing body of the municipality "*at such hearing* or any adjournment thereof, shall have the power to adopt such offer or offers, propositions, *or bids, and enter into such contract or contracts,* as they shall deem to be to the best interest of the municipality." (Italics are ours.) Since

50

this discretionary authority has been vested in the designated officers of the Town, it is not for the courts to interfere with its lawful exercise.

III. Appellants have certified to this court the proposal and bid submitted by the Mankato Electric Company to support their contention that it was signed by the bidder. The blank forms of all proposals of bids were prepared by the engineer for the defendants, and were sent out on requests therefor received either by the town clerk or by the engineer. These forms consisted of the proposal or bid itself, and also of a second part, called a "data sheet" for a statement of the make, type, or character of any equipment or material included in the proposal. Another part of the form contained blanks for any proposed alternate bids. Each of these separate parts, on the last sheet thereof, contained blank lines for the signature of the bidder. The last paragraph of the said first part, or the proposal, or bid proper, stated *"The undersigned bidder hereby agrees * * *."* (Italics are ours.) This part of the proposal or bid, in question, was not signed. It contained a bid for $10,607 on section three, and a bid of $28,363.97 on section four. On section three this bid was the third from the highest of nine other bids, and on section four, it was the lowest by $514 of fourteen other bids. The "Instructions to Bidders" provided that "in case of corporations the same [bid] shall be signed by a legally authorized representative of the corporation."

The "data sheet" of this proposal, stating that the make of the switchboard, instruments and meters, were "General Electric," and that the poles were "Southern Yellow Pine," was signed "Mankato Electric Co. By J. P. Salfer." An alternate bid of $5,130.57 on "Northern or Eastern Cedar Poles" was signed in like manner. It is clear from the instrument itself that the essential part of the proposal was not signed. The defendants had the right to waive such defect, but they also had a right to insist upon the due execution of the written proposal by a proper signature. This is true, notwithstanding the required check of $2,000, or 5 percent of the bid, accompanied the instrument. The defendants were not required to take a chance of possible litigation because of the defective instrument, and they had a legal right to give no consideration to the bid.

■■ IV. The appellants insist that the defendants were required to accept such bid on each section of the work as was submitted by the lowest responsible bidder therefor, to the end, and with the result that contracts should have been awarded to the lowest responsible sectional bidders. They do not claim that the award should have been made to the lowest bidder, but insist that the lowest responsible bidder on each section should have been selected. There is no statutory provision requiring that either the lowest bidder, or the lowest responsible bidder at a letting under the Simmer Law should be selected. Code section 6134.10 provides that governing officials "shall have the power to adopt such offer or offers, propositions, or bids, and enter into such contract or contracts, as *they shall deem to be to the best interest of the municipality.*" (Italics are ours.) By this provision, the legislature has vested a judicial discretion in the governing officers of the municipality. The amount of the bid is, of course, a matter for careful and weighty consideration, but other considerations may tip the balance in favor of a higher bid. The specifications provided:

"The municipality reserves the right to reject any or all bids submitted and to waive defects in any bid and to accept such proposal or proposals as they deem to the best interests of the municipality. The municipality reserves the right to consider such factors as horsepower or kilowatt rating, materials and methods of construction, fuel and lubricating oil consumption, experience and responsibility of contractor, etc., in determining which proposal or proposals they deem to be to the best interest of the municipality."

The specifications gave the widest selection with respect to the make of Diesel engines, generators, switchboards, etc. The bids included six or more different makes or types of engines. The same was true of generators and switchboards. Different makes of standard engines have different horsepower ratings. To accommodate as many of these different makes as possible, the horsepower capacity was placed between 650 and 750, with no engine having a lower rating than 300 horsepower.

The appellees contend that not only was the accepted bid for the best interest of the Town, but that a proper and correct

appraisal of what the bidder offered the Town in consideration for the bid, makes it in fact the lowest bid.

The proposal of the successful bidder on each section was:

| Section | 1 | $20,994.00 |
|---------|---|------------|
| Section | 2 | 45,987.00 |
| Section | 3 | 9,391.00 |
| Section | 4 | 30,561.59 |

The final lump sum bid was $105,344. The bidder on section two offered two engines, each with a horsepower capacity of 375, thus equaling the top limit of 750 horsepower fixed by the specifications. The bidder also offered on this section two standard generators, of any make selected by the Town, each with a kilowatt rating of 260 or 520 for both.

Four other bidders each offered two engines of 375 horsepower each. Their bids on section two were respectively $47,-132.68, $46,260, $50,372, and $44,680. The last bid was by Fairbanks, Morse & Company, but its total bid on all sections was $106,490, and the kilowatt rating of its two generators was but 500. Fairbanks, Morse & Company's second bid on all four sections was $103,952, for which it offered two engines of 375 horsepower and 300 horsepower and generators of a total capacity of 450, making the cost per horsepower $154 and the cost per kilowatt $231, while the successful bid of $105,334 for 750 horsepower and 520 kilowatts capacity makes a cost per horsepower of $144.44, and a cost per kilowatt of $202.56. The latter bid was thus lower in fact than any other lump-sum bid.

Appellants, however, insist that the bid was not lower than a combination of the lowest sectional bids. This is true, if the face of the bids in dollars and cents alone be considered, and what was received therefor be disregarded. Both sides, in argument, agree that this combination bid approximates $96,153 ($9,181 less than the accepted bid), with a horsepower and kilowatt capacity of respectively 675 and 450, and a cost per horsepower of $142.44, or $2.00 per horsepower higher than the successful bid, and a cost of $153 per kilowatt, or $11 per kilowatt more than the bid that was accepted.

The defendants' engineer testifying in their behalf stated that the accepted bid carried a capacity of 70 kilowatts in excess of the kilowatt capacity of the lowest combination bid. He

stated that each kilowatt had a fair value of $90. There is no testimony disputing this. This would give the accepted bid a valuation of $6,300 for the 70 excess kilowatts. He also testified that the four cycle engines with oil-cooled pistons of the accepted bid would have a longer life and a lubrication saving of $1,500 over a ten-year period, as against the two cycle engines and non-oil-cooled engines of the lowest combination bid. It was his opinion that placing the work in charge of one contractor, instead of in the hands of three or four different contractors, would effect the completion of the work by at least a month earlier, for a saving of $1,500 in supervision expense, interest saving, and net revenue. The accepted bidder, in his judgment, had greater experience in the work than the low separate bidders. There were other advantages more difficult to evaluate in dollars. The total value of the estimated advantages, which we have no reason to question under the record, wipes out the apparent monetary difference between the two bids. The purpose in buying two engines and two generators is to always have one unit in reserve, in the event of a breakdown, or to use while repairing or resting the other unit. The peak load of the plant at the time of the trial was 195 kilowatts. Appellants argue that it was unnecessary to buy so much reserve kilowatt capacity. For the reasons mentioned, it is necessary to have two units. With the steady increase in the use of various electrical equip-. ment, the load of the plant will likely increase from year to year. In the low combination bid one generator had a kilowatt capacity of but 200 or but 5 kilowatts in excess of the present peak load of 195. The amount of kilowatt capacity is a matter for the reasonable judgment of the town officers and their engineer. This court ought not interfere with that judgment and discretion unless it has been abused. We cannot so find. Appellants have alleged that the hearing of April 10, 1940, was a sham and a fraud, and that the officers wrongfully conspired to defeat fair competitive bidding. There is no direct evidence in support of this contention, and the appellants do not claim that there is. But they do insist that there is constructive fraud, or fraud to be inferred from the circumstances. There is, of course, no presumption of fraud. It must be clearly proven. There is a presumption that public officers do their duty. The work of the con-

tractor has been held up by this litigation. The voters had an opportunity to show their disapproval before spending any more money, and yet on January 15, 1941, they refused a franchise to the plaintiff by a larger majority than was accorded the defendants at the election on October 12, 1939. It is some indication that the citizens of the Town believe in the honesty of their officials. Appellants see indicia of fraud because the successful bidder joined with the defendants in employing attorneys to protect their rights in this litigation. This fact, in our judgment, has no tendency to establish either fraud or favoritism in awarding the bid. It is our conclusion that the record would not warrant us in disturbing the decree because of the matters discussed in this division.

█ V. It is conceded that if the obligation of the contract which is attacked, or of the bonds to be issued thereunder, is a debt within the purview of section 3 of Article XI of the Constitution of Iowa, providing that "No county, or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount, in the aggregate, exceeding * * *," the debt limit will be exceeded.

Appellants contend that the obligation which the Town has contracted is such a debt. This court has already passed upon the question and has held contrary to the position taken by appellants, in Wyatt v. Town of Manning, 217 Iowa 929, 250 N. W. 141. Appellants concede this but urge that since the chief reliance of the court in support of its holding in the Wyatt case was the case of Swanson v. City of Ottumwa, 118 Iowa 161, 91 N. W. 1048, 59 L. R. A. 620, which has been overruled in Brunk v. City of Des Moines, 228 Iowa 287, 291 N. W. 395, the Wyatt case should also be overruled. The Wyatt case and the one now before us are clearly distinguishable from the Swanson and the Brunk cases. Our case of Johnston v. City of Stuart, (Iowa), 226 N. W. 164, has been cited a number of times as holding contrary to the position urged by appellants. It did clearly so hold. It was referred to in Pennington v. Town of Sumner, 222 Iowa 1005, on page 1023, as being "not officially reported," meaning, as noted in 270 N. W. 629, on page 638, "not reported in the state reports." The opinion was in fact withdrawn on June 23, 1930, because the plaintiff-appellant had, on grounds not bearing

on this question, no longer any right to prosecute the appeal. We mention this simply to clarify the matter.

In the Swanson and Brunk cases *taxes were levied upon all taxable property* for the payment of the obligations. The bonds, or the other evidences of liability, were issued in anticipation of the collection of these public revenues or taxes. Taxes or other public revenues are the property of the sovereign, and when they are used to pay an obligation, the property of the state, or municipality, is used, and its credit is pledged, to that end. Necessarily the obligation so paid becomes a debt of the state, or municipality, as the case may be. In the Swanson case, in addition to the two-mill special levy, there was to be a five-mill tax to make up any deficiency in the two-mill tax. The projected improvement and its earnings were also pledged as collateral security. In the Brunk case, the obligations were to be paid solely from taxes, and for purposes which brought in no revenue in return. They were non-self-supporting projects. The purpose of constitutional and statutory debt limitations is to prevent overburdensome taxation. In this state, and in many of the states, the limits were made narrow and strict because of the reckless voting of benefits and bonuses to railway companies. For that reason, the financing of municipally owned utilities, necessary for the well-being and protection of the public, which required substantial sums of money, was made difficult, and in many cases impossible. This is particularly true during depression periods when taxing values decline. To overcome these obstacles various plans have been evolved in all of which the financing of the project is effected exclusively by the pledging of the revenues of the enterprise, aided usually by the security of the physical property of the new project itself. Instead of the pledging of taxes, revenue bonds are issued payable solely from the earnings of a revenue-producing, self-liquidating municipal enterprise. It is apparent that the soundness of this method of financing depends upon a number of factors, among them the necessity or propriety of the project, the economic soundness of its self-liquidating capacity, and capable stewardship in its administration. Legislation has been enacted in 40 or more of the states, including Iowa, authorizing this type of financing. Under this legislation projects of widely varying types have been so

financed. The soundness or expedience of such legislation is a matter of which this court can take no cognizance, as this is a matter for the determination of the legislature. The legislative provisions having to do with such municipal financing are found in 1939 Code sections 6134.01 to 6134.05, both inclusive. These sections specifically provide that cities and towns may issue "negotiable interest-bearing revenue bonds payable from and secured by the net earnings of the plant, and may also be secured by the pledge of the property purchased, which bonds shall not constitute a general obligation of such city or town or be enforceable in any manner by taxation." The bonds on their face recite these facts, and that they are to be solely and only paid in that manner, "and under no circumstances shall the city or town be in any manner liable by reason of the failure of said net earnings to be sufficient for the payment thereof."

The only question for determination, in this division of the opinion, is whether these bonds are debts within the terms and intendment of the constitutional provision. In our judgment, they are clearly not such debts. First, the legislature expressly states that they are not general obligations of the municipality, nor enforceable in any manner by taxation, and it is not liable for their payment because of any deficit in the net earnings. Words could hardly more plainly or specifically state the nonliability of the municipality. A "debt" is defined by Webster as "that which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another, or to perform for his benefit." There is no money, goods, or services due from the Town of McGregor which it can be required to pay, deliver, or furnish to a holder of any of these bonds. None of its resources or property can be taken for, or subjected to, the payment of any bond. The legal title to the constructed improvement may be in the Town, but such title, and the possession of the property, came to it subject to and burdened by the pledge of the property and its earnings to the payment of the bonds. The pledge preceded such title and possession. Hogan v. City of Corning, 217 Iowa 504, 250 N. W. 134; Greaves v. City of Villisca, 217 Iowa 590, 595, 251 N. W. 766. The property was nonexistent until it came into being because of the pledge, and if it be taken in payment of the obligation no property of the Town or of

its citizens or taxpayers is taken or depleted. The bondholders are at all times the real and equitable owners of the improvement and its earnings until the bonds are paid. The pledges incur no debt on the part of the Town but partake of the nature of a lien for the purchase price of the improvement and its revenue, or of purchase-money mortgages with no personal liability on the part of the maker. The creditor must look to the property alone, which his own capital has produced, for his recompense. The bonds do not constitute a debt, direct or contingent, within the constitutional limitation. Compulsory exercise of the taxing power as a means of enforcing liability is expressly withheld, and the bond, itself, so notifies its holder. No property *presently owned* by the Town could ever be called upon to pay for the new improvement. To constitute a debt against the Town, there must be an obligation which it must meet with its funds or property. It is a pecuniary liability or a charge against its general credit. As said by the Michigan court, of similar bonds, in Young v. City of Ann Arbor, 267 Mich. 241, 253, 255 N. W. 579, 584:

"Such bonds are not payable by the city. It does not assume and agree to pay them. It can levy no tax upon the people for their payment. They are exactly what they purport to be, self-liquidating revenue bonds, and the purchaser thereof can have recourse for their payment only to the revenues to be derived from the operation of the sewage disposal plant."

These bonds cast no additional burdens upon the taxpayers of McGregor. The consumers of electric energy have been receiving it from the plaintiff-appellant, and paying their money therefor to that company. Will their burden be any greater because hereafter their transactions will be with the Town? There is no evidence that it will be. In Barnes v. Lehi City, 74 Utah 321, 341, 279 P. 878, 885, the court said:

"When, as here, a uniform rate must be charged for the product of the plant, the burden falls wholly upon the consumers who pay in proportion to the benefits received by them. In making the purchase, the consumers act entirely upon their own volition. They pay for a product furnished them at their own request, and which is essential to their comfort and convenience. The credit of the city is not extended, nor is any money which is de-

rived from taxation or other existing sources of revenue expended, in the purchase price or maintenance cost of the plant. The city cannot be coerced into applying any part of its general revenue for the payment of the purchase price of the plant or for any part of the cost of maintenance thereof. * * * The revenues to be received under the plan are not moneys of the city.''

The general rule approved and announced by the overwhelming preponderance of authority, of the text writers, commentators and of the courts, is that the constitutional or statutory debt limitation does not apply to an indebtedness incurred in the construction of a public project to be paid for wholly out of the revenue and income arising from the operation thereof. 6 McQuillin, Municipal Corporations, 2d Ed., section 2389; 44 C. J. 1131, section 4064; 19 R. C. L. 985, section 281; 72 A. L. R. 688 et seq. No court which has announced this rule, so far as our investigation shows, has ever abandoned it. The following list of cases, which is by no means exhaustive of the decisions, gives early and later decisions of the various state courts, which support the rule: Bankhead v. Town of Sulligent, 229 Ala. 45, 155 So. 869, 96 A. L. R. 1381; Smith v. Waterworks Board, 234 Ala. 418, 175 So. 380; Oppenheim v. City of Florence, 229 Ala. 50, 155 So..859; Mississippi Valley Power Co. v. Board of Improv., 185 Ark. 76, 46 S. W. 2d 32; McCutchen v. Siloam Springs, 185 Ark. 846, 49 S. W. 2d 1037; McGehee v. Williams, 191 Ark. 643, 87 S. W. 2d 46; Jernigan v. Harris, 187 Ark. 705, 62 S. W. 2d 5; Board of Regents of University of Arizona v. Sullivan, 45 Ariz. 245, 42 P. 2d 619; Crawford v. City of Prescott, 52 Ariz. 471, 83 P. 2d 789; Guthrie v. City of Mesa, 47 Ariz. 336, 56 P. 2d 655; Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P. 2d 82; Shelton v. City of Los Angeles, 206 Cal. 544, 275 P. 421; Department of Water & Power of Los Angeles v. Vroman, 218 Cal. 206, 22 P. 2d 698; Housing Authority of Los Angeles v. Dockweiler, 14 Cal. 2d 437, 94 P. 2d 794; Shields v. City of Loveland, 74 Colo. 27, 218 P. 913; Reimer v. Town of Holyoke, 93 Colo. 571, 27 P. 2d 1032; Montgomery v. City and County of Denver, 102 Colo. 427, 80 P. 2d 434, 440; State and Diver v. City of Miami, 113 Fla. 280, 152 So. 6; Dickey v. City of Fort Lauderdale, 136 Fla. 241, 186 So. 427; State v. Regents of University System of Georgia, 179 Ga. 210, 175 S. E. 567, 573; Williams v. McIntosh County, 179 Ga. 735, 177 S. E.

248; Williamson v. Housing Authority, 186 Ga. 673, 199 S. E. 43; Ward v. City of Chicago, 342 Ill. 167, 173 N. E. 810; Hairgrove v. City of Jacksonville, 366 Ill. 163, 8 N. E. 2d 187; Maffit v. City of Decatur, 322 Ill. 82, 152 N. E. 602; Krause v. Peoria Housing Authority, 370 Ill. 356, 19 N. E. 2d 193, 201; Simpson v. City of Highwood, 372 Ill. 212, 23 N. E. 2d 62, 124 A. L. R. 1459; People ex rel. City of Chicago v. Barrett, 373 Ill. 393, 26 N. E. 2d 478; Underwood v. Fairbanks, Morse & Co., 205 Ind. 316, 185 N. E. 118; Letz Mfg. Co. v. Pub. Serv. Com., 210 Ind. 467, 4 N. E. 2d 194; Fox v. City of Bicknell, 193 Ind. 537, 141 N. E. 222; City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004; Security Trust Co. v. City of Paris, 264 Ky. 846, 95 S. W. 2d 781; State ex rel. Porterie v. Housing Authority of New Orleans, 190 La. 710, 182 So. 725; Michigan United L. & P. Co. v. Village of Hart, 235 Mich. 682, 209 N. W. 937; Michigan Gas & Electric Co. v. City of Dowagiac, 278 Mich. 522, 270 N. W. 772; Young v. City of Ann Arbor, 267 Mich. 241, 255 N. W. 579; Ritchie v. Harrisville, 291 Mich. 415, 289 N. W. 197; Fanning v. Univ. of Minn., 183 Minn. 222, 236 N. W. 217; Williams v. Village of Kenyon, 187 Minn. 161, 244 N. W. 558; Grossman v. Public Water Supply Dist., 339 Mo. 344, 96 S. W. 2d 701, 706; State ex rel. Sewer Dist. v. Smith, 337 Mo. 855, 87 S. W. 2d 147, 151; Farmers State Bank v. City of Conrad, 100 Mont. 415, 47 P. 2d 853; State ex rel. Blume v. State Board of Ed., 97 Mont. 371, 34 P. 2d 515; Williamson v. City of High Point, 213 N. C. 96, 195 S. E. 90; McGuinn v. City of High Point, 217 N. C. 449, 8 S. E. 2d 462, 128 A. L. R. 608; Brockenbrough v. Board of Water Comm., 134 N. C. 1, 46 S. E. 28; State ex rel. Consumers Public Power Dist. v. Boettcher, 138 Neb. 22, 291 N. W. 709, 714; Thomas v. McHugh, 65 N. D. 149, 256 N. W. 763; Lang v. City of Cavalier, 59 N. D. 75, 228 N. W. 819; Seward v. Bowers, 37 N. M. 385, 24 P. 2d 253; State v. Regents of Univ. of New Mexico, 32 N. M. 428, 258 P. 571; State ex rel. Capitol Addition Bldg. Com. v. Connelly, 39 N. M. 312, 46 P. 2d 1097, 100 A. L. R. 878; Baker v. Carter, 165 Okla. 116, 25 P. 2d 747; Kasch v. Miller, 104 Ohio St. 281, 135 N. E. 813; Pathe v. Donaldson, 29 Ohio App. 171, 163 N. E. 204; State ex rel. Public Bldg. Auth. v. Griffith, 135 Ohio St. 604, 22 N. E. 2d 200, 204; McClain v. Regents of University, 124 Ore. 629, 265 P. 412; Butler v. City of

Ashland, 113 Ore. 174, 232 P. 655; City of Cascade Locks v. Carlson, 161 Ore. 557, 90 P. 2d 787, 791; Tranter v. Allegheny County Authority, 316 Pa. 65, 173 A. 289; Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834, 844; Graham v. Philadelphia, 334 Pa. 513, 6 A. 2d 78; Cathcart v. City of Columbia, 170 S. C. 362, 170 S. E. 435; Clarke v. South Carolina Public Service Authority, 177 S. C. 427, 181 S. E. 481, 488; Town of Selmer v. Allen, 166 Tenn. 476, 63 S. W. 2d 663 (dictum); City of Waco v. McCraw, 127 Tex. 268, 93 S. W. 2d 717, 719; City of Houston v. Allred, 123 Tex. 334, 71 S. W. 2d 251; Barnes v. Lehi City, 74 Utah 321, 279 P. 878; Utah P. & L. Co. v. Ogden City, 95 Utah 161, 79 P. 2d 61; Utah P. & L. Co. v. Provo City, 94 Utah 203, 74 P. 2d 1191; Ennis v. Town of Herndon, 168 Va. 539, 191 S. E. 685, 689; Winston v. Spokane, 12 Wash. 524, 41 P. 888; Twichell v. City of Seattle, 106 Wash. 32, 179 P. 127; Morris v. Ellis, 221 Wis. 307, 266 N. W. 921, 925; Connor v. Marshfield, 128 Wis. 280, 107 N. W. 639; Flottum v. City of Cumberland, 234 Wis. 654, 291 N. W. 777; Arnold v. Bond, 47 Wyo. 236, 34 P. 2d 28; Casto v. Town of Ripley, 114 W. Va. 668, 173 S. E. 886; Brewer v. City of Point Pleasant, 114 W. Va. 572, 172 S. E. 717; Franklin Trust Co. v. City of Loveland, 8 Cir., 3 F. 2d 114; Iowa Southern Utilities Co. v. Cassill, 8 Cir., 69 F. 2d 703; City of Jerseyville v. Connett, 7 Cir., 49 F. 2d 246; Bank of Burlington v. City of Murphysboro, 7 Cir., 96 F. 2d 899; Fairbanks, Morse & Co. v. City of Wagoner, 10 Cir., 81 F. 2d 209. On a later appeal in the last-cited case, there was no departure from the holding on the question, but the court held that the plaintiff was required to pursue other procedure. (10 Cir., 86 F. 2d 288.)

The able attorneys for appellants have earnestly asked us to reconsider and reject our decision in Wyatt v. Town of Manning, supra. This we cannot do. While the question has not since come before us for direct ruling, we have in a number of cases indirectly affirmed the holding in that case. See Burns & McDonnell Eng. Co. v. Iowa City, 225 Iowa 1241, 1244, 282 N. W. 708; Greaves v. City of Villisca, 217 Iowa 590, 251 N. W. 766; Interstate Power Co. v. Forest City, 225 Iowa 490, 500, 281 N. W. 207; Chitwood v. Lanning, 218 Iowa 1256, 1259, 257 N. W. 345.

In Brunk v. Des Moines, 228 Iowa 287, 291 N. W. 395, we referred to cases from the states of Alabama, Oregon, Illinois

and Kentucky, which criticized Swanson v. Ottumwa, 118 Iowa 161, 91 N. W. 1048, 59 L. R. A. 620. As may be noted from the list of cases cited above, the courts of all of these states support our position in this case. Also, the 8th Circuit Court of Appeals in Ottumwa v. City Water Supply Co., 8 Cir., 119 F. 315, 59 L. R. A. 604, vigorously disagreed with the opinion of this court in the Swanson case, but as noted above, that court supports the general rule stated herein, and in Iowa Southern Utilities Co. v. Cassill, 8 Cir., 69 F. 2d 703, 707, expressly approved Wyatt v. Town of Manning, supra.

Appellants cite, in support of their contention, Feil v. City of Coeur d'Alene, 23 Idaho 32, 42, 50, 129 P. 643, 646, 649, 43 L. R. A., N. S., 1095, an opinion by a divided court. Its application is much weakened because of the facts. Its constitutional debt limit provision is much broader than the provision in the Iowa constitution. It states: " 'No * * * city * * * shall incur any indebtedness, *or liability, in any manner, or for any purpose* * * *.' " (Italics are ours.) The decision is bottomed upon the italicized words. The opinion states "the framers of our Constitution employed more sweeping and prohibitive language * * * than is to be found in any other Constitution to which our attention has been directed." In referring to cases from other jurisdictions, the opinion states: "The reasoning, however, of those cases utterly fails when applied to our Constitution, for the reason that none of those cases deals with the word 'liability,' which is used in our Constitution, and which is a much more sweeping and comprehensive term than the word 'indebtedness.' " Other matters distinguishing that decision from the one before us could be pointed out. The California constitutional provision includes the word "liability" but the decisions of that state do not follow the Idaho decisions. While the Idaho court still follows the Feil case, it said in Miller v. City of Buhl, 48 Idaho 668, 678, 284 P. 843, 845, 72 A. L. R. 682:

"If this question were here for the first time, in view of the decisions relied on by defendants, this court might not reach the conclusion arrived at in the Feil case. Indeed, it might be better, in view of the tax burden imposed on real property, for the con-

sumers of water, electricity, etc., to provide the funds necessary to purchase such water and light systems."

Appellants also place reliance upon City of Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861. In that case, the *present owned* property and the income therefrom were pledged. It is distinguished from the case at bar and its inapplicability pointed out in the cases from Illinois, and City of Jerseyville v. Connett, 7 Cir., 49 F. 2d 246, all cited above.

The fact that the town of McGregor may expressly or impliedly agree to make its rates sufficiently high to raise the required revenue, is not the contracting of a general debt, or a financial obligation. Shelton v. City of Los Angeles, supra (206 Cal. 544, 275 P. 421); Oppenheim v. City of Florence, supra (229 Ala. 50, 155 So. 859).

Neither does the fact that the bonds are secured by a mortgage on the property itself avail the appellants. 72 A. L. R. 697, and cases cited; Clarke v. South Carolina Public Service Authority, supra (177 S. C. 427, 181 S. E. 481, 489).

The Utah court in Utah P. & L. Co. v. Ogden City, supra (95 Utah 161, 79 P. 2d 61), was asked to repudiate its holding in Barnes v. Lake City, supra. The court, in refusing, said on page 171 of the Utah report, page 66 of the Pacific report:

"We have no disposition to do so. * * * The steady growth in recent years of the practice of financing by this method the purchase or construction of public utilities by cities and towns, as denoted by increasing and now general recognition and approval of the special fund doctrine by the courts, affords persuasive, indeed convincing, evidence of its soundness and utility. As such, it is peculiarly in the public interest. Because of the fact that most cities and towns are so largely indebted that they cannot acquire and pay for expensive utilities out of their general revenues, or by bonds within their constitutional limits of debt, the special fund rule offers the only means of relief from helpless dependence upon an exclusive private market."

Our conclusion is that the Town by its proceedings has not offended against the constitutional debt limit provision.

The judgment and decree appealed from is affirmed.—Affirmed.

HALE, C. J., and STIGER, OLIVER, GARFIELD, WENNERSTRUM, and MILLER, JJ., concur.