17 Md. App. 646 (1973)
303 A.2d 432
LOYOLA FEDERAL SAVINGS AND LOAN ASSOCIATION
v.
TRENCHCRAFT, INC. ET AL.
No. 479, September Term, 1972.
Court of Special Appeals of Maryland.
Decided April 27, 1973.
The cause was argued before MORTON, MOYLAN and SCANLAN, JJ.
*647 James J. Doyle, Jr., with whom were John B. Jaske, Sherbow, Shea & Doyle, Leo William Dunn, Jr., and Nylen & Gilmore on the brief, for appellant.
Henry J. Noyes for appellees.
SCANLAN, J., delivered the opinion of the Court.
Appellant, Loyola Federal Savings and Loan Association appeals from a judgment entered against it in a civil action for fraud[1] which was tried without a jury in the Circuit Court for Montgomery County, Maryland. Plaintiffs in the suit, and appellees here, are Trenchcraft, Inc., H.C. Ladd & Son, Inc., Automatic Equipment Sales of Washington, Inc., and Eckington Building Supply Co. Loyola made construction loans on two substantial apartment house projects being built in Prince George's County. The appellees were among subcontractors who furnished labor and materials for one or both of these projects. They instituted their suit against the appellant on July 10, 1970.
The essence of appellees' action is their claim that in the spring of 1966 the appellant, by wilful, material misrepresentations and deliberate failure to disclose material facts, fraudulently induced them to release their respective rights to mechanics liens on the two construction projects and to accept in place thereof valueless notes secured by partially encumbered assets, and that those assets were later sold, without notice to, or the knowledge on the part of, the appellees, at prices significantly below their real value, all to appellees' substantial damage.
Hearings in the court below were concluded on October 21, 1971. On July 20, 1972, the trial judge filed a memorandum opinion and order in which he held, inter alia, "that the plaintiffs have established their claims *648 [of fraud] by a fair preponderance of the evidence." He then proceeded to award compensatory damages in the collective amount of $127,910.44, and, in addition, to grant $10,000.00 in punitive damages to each of the four appellees.
In this Court, appellant contends that:
1. The trial court erred in applying the "fair preponderance of the evidence" standard of proof, since fraud must be demonstrated by clear and convincing evidence.
2. There was no clear and convincing evidence that the appellant defrauded the appellees.
3. The appellees failed to demonstrate ordinary diligence in attempting to learn of the alleged fraud and thus cannot avoid the bar of the statute of limitations.
4. The trial court erred in awarding punitive damages since there was no relation of trust between Loyola and the appellees, and there are no extraordinary or exceptional circumstances clearly indicating malice and wilful fraud on the part of the appellant.
For the reasons set forth below, we hold that the trial court erroneously applied the "fair preponderance of the evidence" standard, when it should have weighed the evidence in the light of the "clear and convincing" standard of proof which applies in an action based on fraud. For that reason, as appears below, we vacate the judgment and remand the case to the trial court for further proceedings, as specified in this opinion infra.

SUMMARY OF THE FACTS
In view of the tentative disposition of Loyola's appeal which we make at this stage, we need not draw a complete mosaic of all the intricate facts out of which this controversy emerges. We do set forth at this point, however, a summary of the major material facts of the case.
*649 In 1964, Ralph D. Rocks, a local builder and speculator in real estate, introduced John Gordon Bennett, a friend of his from up-state New York, to Samuel Borden, Rogers Israel and Joseph Mossmiller, all executive officers of the appellant, Loyola Federal Savings and Loan Association. Bennett purchased a 90 acre tract of land in Prince George's County, known as Potomac Heights, from Rocks. The purchase price was $2,800,000. Of this purchase price, Bennett paid from $50,000 to $100,000 down. Prior to the sale, Rocks had obtained a permanent, long term mortgage commitment from Prudential Life Insurance Company of America in the amount of $5,250,000 for the apartment development of 27.8 acres of the 90 acre Potomac Heights tract. Title to the property was taken in the name of Nuggett Land Company, Inc., a company formed by Rocks' attorney.
Rocks went to Rogers Israel, then president of Loyola, and arranged for three loans on the Potomac Heights property. The three loans were as follows:
1. A Deed of Trust dated July 22, 1964 from Nuggett to Loyola in the amount of $5,250,000, secured by the improvements on a 27.8 acre tract and the tract itself. Loyola was periodically to advance money to pay for construction, but was to retain 10% of the loan, or $525,000, until construction was completed.
2. A land loan was placed on the remaining 63 plus acre parcel in the amount of $1,000,000. This loan was secured by a Deed of Trust from Nuggett to Loyola on the 63 plus acre parcel.
3. The balance of the purchase price of the land was secured by a Deed of Trust from Nuggett to Rocks, constituting a junior lien on the entire 90 acres of land comprising Potomac Heights.
*650 Rocks also owned a long-term lease on a tract of land in Laurel, Maryland, known as Fox Rest. He assigned this lease to Bennett. Rocks had obtained a permanent loan commitment from the Massachusetts Mutual Life Insurance Company in the amount of $3,075,000 for the development of a 25 acre parcel of the tract known as Fox Rest, Section I. Rocks then formed a company, Prince-Mar Builders, Inc., to take title and finance the transaction. The financing was as follows:
1. The first 25 acre parcel of Fox Rest was made subject to a construction loan in the amount of $3,075,000 from Loyola to Prince-Mar, secured by a Deed of Trust dated November 25, 1964.
2. On November 25, 1964, Prince-Mar gave Rocks a Deed of Trust in the amount of $503,185.00 in the form of a purchase money Deed of Trust subordinate to Loyola's construction loan.
3. A third Deed of Trust in the amount of $350,000 was given by Prince-Mar to Rocks and his wife in the form of a purchase money Deed of Trust, again subordinate to Loyola's construction loan.
4. Prince-Mar also obtained a land acquisition loan from Loyola in the amount of $1,041,000, under which Loyola was secured by a Deed of Trust on the remaining 66.88 acres of Fox Rest, which were not to be improved at that time.
The appellees furnished labor and materials to the Potomac Heights and Fox Rest projects under contracts with Sagamore Construction Company of Maryland, a company owned by Bennett, which acted as the general contractor for the Potomac Heights and Fox Rest projects. In 1964 and 1965, the subcontractors had no contractual relations with Loyola. The appellant advanced the loan proceeds directly to Sagamore which, *651 pursuant to its contracts with the subcontractors, would pay the latter.
For the sale of the Potomac Heights project to Bennett, Rocks received a total of $1,600,000 in cash, $900,000 of which he received at settlement and the remainder over a four and a half month period. In the case of Fox Rest, Rocks received $941,000 at settlement and an additional $200,000 within 120 days of settlement. Unknown to the appellees, but known to some of the executive officials of Loyola, was the fact that proceeds from the construction loan funds would be and were used to pay Rocks for the balance of the purchase prices of the Potomac Heights and Fox Rest projects. Federal regulations prohibited the use of construction loan funds to pay loans securing the purchase price of land. A business practice to the contrary was not unknown in 1964.
One method of drawing down construction funds to pay off the land loans held by Rocks was by requisitioning funds for architectural, engineering and other fees which were much greater in amount than the actual fees. These requisitions were submitted by Bennett and were approved by Loyola. Generally, requisitions were approved by equating the percentage of work then completed with the percentage of the total construction loan requested.
By 1965, Sagamore began to fall behind in its payments to subcontractors. Appellee, Automatic Equipment Sales of Washington, Inc., was owed $25,000 by Sagamore. Automatic Equipment got in touch with Loyola and was assured by the latter that there was no problem. Automatic was told that Loyola was retaining 10% of the proceeds of the loan and that if it had any doubt of the ability of Sagamore to pay to get in touch with either Sagamore or Mr. Bennett. Appellee, Eckington Building Supply Co., also inquired concerning an overdue bill in 1965, and was advised by Loyola that there were no problems on the job and that the requisite *652 draws on construction loans did not exceed the construction completed.
In January 1966, Loyola received a report that the two projects were having difficulty. It learned that there was a lag in construction and that various subcontractors had been given notes rather than being paid in cash. In February 1966, Loyola investigated the two projects. A meeting of the subcontractors was held early in March, at which time they were advised by Loyola that both projects were in financial trouble. They were told that Bennett had drawn from 80% to 90% of the construction funds, but that only 70% to 80% of construction had been completed. Loyola advised the subcontractors that it was ready to assert its right of foreclosure. Foreclosure by Loyola at that time would have eliminated the junior trusts on both properties and probably would have caused the loss of the promised permanent financing on each of them. Those commitments had time limitations which had to be met if they were to be honored by the permanent lenders.
At this time, Sagamore owed each of the appellees for work and materials supplied. Loyola proposed an arrangement under which the subcontractors would relinquish their right to file mechanics liens against the construction projects, so that an attempt could be made to complete them. The appellees agreed.
The terms of the arrangement, although different in amount, were generally the same, i.e., each of the subcontractor appellees received some cash and took a note in an amount approximately equal to 10% of the monies so far billed to Sagamore. The appellees were to be paid in cash for any subsequent work and materials which they furnished Sagamore. Both H.C. Ladd & Son, Inc. and Eckington Building Supply Company received a one year note from Sagamore signed by Joseph Mossmiller, the vice-president of Loyola, who had taken over the operations of Sagamore in the wake of the latter's default. These notes were personally endorsed by the Bennetts. Trenchcraft, Inc. received a one year note *653 made personally by the Bennetts; Sagamore did not make nor endorse this note. Automatic Equipment Sales of Washington, Inc. already had a one month note made by Sagamore through Gloria Bennett as president and L. Scott as vice-president. In addition, the note was endorsed by both Bennetts. As a part of the agreement Automatic agreed to forbear on the note for one year. At the time these notes were given, Sagamore had no net assets.
At about the same time, on March 29, 1966, an agreement was executed between Richmer Realty Corporation, the Bennetts and Rocks. Richmer was a company created and controlled by Loyola which had taken over the Potomac Heights and Fox Rest projects in an attempt to complete their construction and avoid foreclosure. In addition to the assignment of the two construction projects, under the March 29, 1966 agreement all of the Bennetts' interests in seven properties listed in a schedule attached to and made a part of the agreement were also assigned to Richmer. The agreement provided that Richmer could sell these assets to obtain funds to satisfy the indebtedness remaining on the deeds of trust held by Loyola and by Rocks and to satisfy obligations for work and materials which the owners of the property had incurred in constructing the apartment house projects through March 10, 1966. Under the agreement, Loyola had a first priority in the proceeds of any sale by Richmer of the Bennetts' assets. The agreement prohibited Richmer from selling the assets pledged by the Bennetts without giving the latter written notice.
There was testimony that certain appellees either knew or should have known of the March 29, 1966 agreement between Richmer, the Bennetts and Rocks, and that in their agreements they either directly, or through their attorneys, assented to it. In addition there is testimony indicating that at least one appellee knew nothing of the March 29, 1966 agreement. In any event, each appellee, as a result of the terms of the agreement, was made a third party beneficiary of it.
*654 There was testimony that at least one of the appellees was told by representatives of Loyola that the Bennetts' assets pledged under the agreement would be used as security to pay the notes. There was also testimony that Bennett had been promised by executives of Loyola that the assets which he and his wife had assigned to Richmer would not be sold. Mossmiller told some of the appellees that the Bennett assets were worth from $500,000 to $1,000,000.
Of the seven properties which Bennett assigned to Richmer under the March 29, 1966 agreement, three were valueless. Bennett owned no interest in a corporation which was erroneously listed as an asset, and his stock in Sagamore Construction and Sagamore Management, Ltd. was worthless due to Sagamore's defaults. The major assets assigned to Richmer under the agreement included a 128 plus acre farm in Loudoun County, Virginia, and a 1,071 acre farm in Charlottesville, Virginia. Bennett also had a stock interest in a New York corporation which owned a home, rented by Bennett, and 4 acres of land in Brighton, New York, near Rochester.
In the fall and early winter of 1966, Richmer, without notice to the appellees, disposed of Bennetts' assets to two New York corporations. Richmer realized a net return of approximately $500,000 upon the disposition of these assets. These proceeds were put into the construction projects at Potomac Heights and Fox Rest.
It appears from the evidence that Bennett's attorneys had either direct or indirect interests in the two corporations to whom the two farm properties were sold.
In 1967, Loyola foreclosed on the several deeds of trust on both apartment house projects. The first 28.7 acre section of the Potomac Heights project had been completed. Loyola then sold 30 acres of the remaining 60 acres of unimproved land at Potomac Heights for $660,000, which paid a portion of its $1,000,000 land loan on the Potomac Heights property. Loyola also bought in at the foreclosure sale, and continues to hold, the remaining 30 acres of Potomac Heights, which it *655 claims cannot be developed. Loyola also acquired the 60 acres of unimproved land at Fox Rest. These 60 acres are under a sewer moratorium and, Loyola alleges, thus are not salable at present. The 30 acre unimproved parcel at Potomac Heights which Loyola now holds is subject to a balance of $340,000 remaining on the original $1,000,000 land loan which Loyola made to Sagamore.
The monies due the appellees for work and materials furnished Sagamore in connection with the Potomac Heights and Fox Rest projects prior to March 10, 1966 amounted to $127,000.
On October 23, 1969, the appellees learned, through a newspaper article, that Israel, the president of Loyola, and Rocks had been indicted in the United States District Court for the District of Maryland for fraudulent statements and actions in violation of federal law relating to funds insured by the Federal Savings and Loan Insurance Corporation. Appellees filed their action for fraud on July 10, 1970.

I

THE CLEAR AND CONVINCING STANDARD OF PROOF SHOULD HAVE BEEN APPLIED
In his memorandum opinion of July 20, 1972, after making certain findings of fact, the trial judge stated that:
"The court adopts the arguments and the authorities advanced by the plaintiffs in their memorandum and holds that the plaintiffs have established their claims by a fair preponderance of the evidence. Therefore, on this 20th day of July, 1972, the Court finds for the plaintiffs." (Emphasis added.)
In many jurisdictions, the trial court would have been correct in holding the "fair preponderance of the evidence" *656 to be the requisite standard of proof in an action for fraud or deceit.[2] Indeed, the majority rule seems to be "that fraud may be proved in a civil case by a preponderance of evidence, the same as any other material fact is proved in such a case." 37 Am.Jur.2d 642 (1968). Courts of other States, however, hold that in order to establish fraud, the evidence must be: "clear and satisfactory," Lalone v. United States, 164 U.S. 255, 257 (1896); "clear, cogent and convincing," Interstate Power Co. v. Incorporated Town of McGregor, 230 Iowa 42, 296 N.W. 770 (1941); or "clear and convincing," Southern Development Co. v. Silva, 125 U.S. 247 (1888).
These departures from the general rule of proof which usually prevails in a civil case, i.e., preponderance of the evidence, have been criticized as requiring too high a degree of proof. 37 Am.Jur.2d at 645. Nevertheless, it appears that Maryland must be numbered as among the States which still continue to require more than a preponderance of evidence in establishing fraud in an action at law. In justification of the minority rule it can be said that requiring a stricter standard of proof in fraud cases minimizes the danger that actions for fraud will be used improperly as substitutes for suits for breach of contract. Personal and business reputations should not be saddled with the stigma of fraud when the conduct complained of is basically a failure to abide by the terms of an agreement or understanding.
Controlling, in our view, is Rent-A-Car Co. v. Globe & Rutgers Insurance Co., 161 Md. 249, 267-68, 156 A. 847 (1931). There, the appellant attempted to recover for a loss caused by fire. The defendant insurance company asserted fraudulent conspiracy as a defense. The trial was before a jury and the court instructed it that *657 the degree of proof required was a "preponderance of the evidence." The Court of Appeals disagreed, saying:
"Upon the facts of this case that prayer was insufficient and misleading. The defense in this case amounted to a charge that the appellant, its officers and employee, had committed a serious criminal offense. In such cases the rule in England is that even in civil cases something more than a mere preponderance of evidence is required to establish guilt ... and, whatever the law may be elsewhere, that appears to be the law of this state." Id. (emphasis added).
The Court of Appeals reversed on that ground among others. In doing so, it said:
"The statement in the prayer therefore that the phrase `preponderance of the evidence' did not import any `particular degree of certainty' was erroneous and misleading in this case, for the evidence to sustain the charge of fraud, which involved the commission of a grave crime, should at least have been sufficiently certain to overcome the presumption of innocence which shielded the plaintiff and its agents." Id. at 268.
In Peurifoy v. Congressional Motors, Inc., 254 Md. 501, 517, 255 A.2d 332 (1969), the Court of Appeals again adverted to the requirement that in this State "proof of actual fraud [must] be clear and convincing and such as will appeal strongly to the conscience of the Court ...," citing Bachrach v. Washington United Cooperative, Inc., 181 Md. 315, 321, 29 A.2d 822 (1943).
As indicated, the requirement that the standard of proof in a civil action for fraud or deceit must be "clear and convincing" is contrary to the general rule which requires only the preponderance of the evidence usually applied in any civil case. Still, it can be argued that, on close reading, the Court of Appeals' decisions in Rent-A-Car, *658 Bachrach and Peurifoy, supra, do not militate against the general rule, are distinguishable on their facts and do not stand for the proposition that the standard of proof in a civil action for deceit demands "clear and convincing" evidence. In Rent-A-Car, an equitable defense was involved; in Bachrach the action was in equity, i.e., a suit to set aside a mortgage on the ground of fraud; and in Peurifoy the reference to the standard of proof required for fraud was dicta only.
Moreover, any requirement of a stricter standard of proof to establish fraud in a civil action may be purely the product of historical accident. Earlier legal authorities harbored a belief, "which appears to have originated in much the same manner as a legend develops, that fraud might be established in a court of equity with a less amount of proof than was required for this purpose in a court of law." 37 Am.Jur.2d at 646. According to some authorities, the subsequent use, of expressions which required the evidence to be "clear and positive," "clear and convincing," "clear and satisfactory," etc., was to insure only that the character of the evidence requisite to prove fraud would not be "doubtful, vague, uncertain, and inconclusive evidence...." Id. at 645; see also, e.g., Hoffman v. Overbey, 137 U.S. 465, 472-73 (1890); Lynn v. Baltimore and Ohio Railroad Co., 60 Md. 404, 413 (1883). However, the argument runs, although originally directed at protecting merely the quality or character of evidence offered to prove fraud, these expressions of extra caution have been misapplied and perpetuated in the cases in a context where they now have taken to refer to the quantum of evidence or standard of proof which must be satisfied to establish fraud.
Thus, it has been suggested that the variety of expressions used by different courts in stating the standard of proof required in establishing civil fraud is merely "a divergence of views on what constitutes a preponderance of evidence, rather than a disagreement *659 with the general rule that a preponderance of evidence is sufficient to establish fraud in a civil case." 37 Am.Jur.2d at 646; Smith v. Rhode Island Co., 39 R.I. 146, 98 A. 1, 4 (1916). In other words, the cautionary admonitions are for the purpose of insuring that the standard of proof in equity did not dip below the level of preponderance.
Whatever the criticisms which logic, semantics, policy and history permit to be directed against requiring the clear and convincing standard of proof in an action for deceit based on fraud, the fact remains, however, that such standard appears to be the law of this State, as enunciated in the decisions of the Court of Appeals discussed previously. Unless those decisions are either explained away or overruled by the Court of Appeals itself, this Court must follow what a majority of its members discern to be the precept to be drawn from them, i.e., proof of fraud in a civil action, either in law or in equity, must be "clear and convincing." Only the Court of Appeals could disabuse us of that notion.
In the instant case, the trial court made no finding that the evidence was clear and convincing. As a result, we do not know whether or not it would have adhered to its conclusion that the appellant was guilty of fraud if it had invoked the stricter and required standard of proof. We must apply the clearly erroneous test of Rule 1086 in reviewing the trial court's findings. Nevertheless, we are obligated to apply that test in the light of the proper standard of proof, a standard which the trial court did not follow. In failing to do so, it erred.

II

DISPOSITIONAL ALTERNATIVES
Having concluded that the trial judge applied the wrong standard of proof in reaching his decision, we must now decide how best to dispose of this appeal. Three alternatives are available. They are:

*660 (1) Remand the case for a new trial;
(2) A review of the evidence by this Court to determine if it satisfies the "clear and convincing" standard;
(3) Remand the case to the trial court for further proceedings, including a redetermination of the issue of alleged fraud under the clear and convincing standard of proof.
If this had been a jury trial and the court had improperly instructed the jury as to the standard of proof to be observed in reaching its decision, the proper disposition would be to reverse the judgment and remand the case for a new trial. Rent-A-Car Co., supra at 268. There is also precedent for doing the same thing in a case in which a trial court, sitting without a jury, has erred as to the standard of proof to be applied. Allis Chalmers Manufacturing Co. v. Wichman, 220 F.2d 426, 432 (8th Cir.1955); Drazin v. Jack Pry, Inc., 154 A.2d 553, 554 (D.C. Mun. App. 1959). In our judgment, however, to remand the case for a new trial would be a drastic disposition of this appeal, involving, as it would, substantial additional expenditures of the parties' money, their lawyers' time, as well as that of the court below, unless it is clearly the only alternative which would fairly protect the rights of the parties.
There is another procedure which this Court could follow in deciding this appeal. We could test the sufficiency of the evidence and the trial judge's findings thereon in the light of the clear and convincing standard of proof, despite his failure to subject them to such scrutiny. If the Court proceeded in that manner in this case we would be stretching, if not abusing, our appellate functions. The record is replete with contested issues of material fact, some of them posing questions of credibility of witnesses. Assessing credibility, including any observation of the demeanor of the witnesses, is primarily the function of the trier of the facts. Maryland Rule 1086; Ritter v. Danbury, 15 Md. App. 309, 313, 290 A.2d 173 (1972).
*661 We believe that the interest of the opposing parties will be best protected at this stage of the litigation by vacating the judgment below and remanding the case for further proceedings, as hereinafter specified. In pursuing that course of procedure, we rely on the analogy we find in Owen v. Commercial Union Fire Insurance Co. of New York, 211 F.2d 488 (4th Cir.1954), involving an appeal arising from the United States District Court for the District of Maryland. In that case, the insured sued the insurer on a fire insurance policy. The insurer defended on the ground that the insured had violated the policy provisions against fraud and false swearing. There the trier of fact, the trial judge, ruled in the defendant's favor. He held that the burden of proof rested upon the plaintiff to "prove by the weight of the credible evidence," that he was not guilty of fraud. That was an error of law. The claim of fraud raised an affirmative defense and the defendant had the burden to show the fraud. In Owen, the Fourth Circuit said:
"The rule that an appellate court will not disturb findings of fact made by the trial judge unless they are clearly erroneous does not apply if he has committed an error of law which has manifestly influenced or controlled his findings of fact ...." Id. at 489.
The Court then vacated the judgment and remanded the case for further hearing, giving the following reasons:
"While we might pass upon the facts ourselves without giving weight to the findings of the lower court in view of his error as to the burden of proof, we think it better, in view of the highly controversial character of some of the questions involved, that they be passed upon in the first instance by the court that has had the advantage of seeing and hearing the witnesses." Id. (emphasis added).
*662 As in Owen, the trial court in the case at bar applied the wrong standard or burden of proof. Similarily, the instant case also presents contested issues of fact of a "highly controversial character." Supported by the analogy we find in Owen v. Commercial Union Fire Insurance Co. of New York, supra, we therefore vacate the judgment and remand the case to the trial court for further proceedings, as provided for in this opinion infra.
In remanding the case, we are aware that the appellant, in addition to arguing that the trial judge applied the wrong standard of proof, also contends: (1) that the statute of limitations bars the appellees' action, since each of them allegedly failed to exercise ordinary diligence in seeking to learn of the alleged fraud; and (2) that there was insufficient evidence of the gross fraud required to sustain the trial court's award of punitive damages. In the present posture of the litigation, however, neither of these two questions is appropriate for decision at this time.
There appears little question but that all of the facts on which appellees' claims of fraud rests occurred no later than the fall or early winter of 1966. Since their action was not filed until July 10, 1970, it ordinarily would be barred by the statute of limitations, unless appellees can demonstrate that they exercised due diligence in attempting to learn of the fraud about which they complain, but were unable to do so. Piper v. Jenkins, 207 Md. 308, 317-18, 113 A.2d 919 (1955); Mettee v. Boone, 251 Md. 332, 338-39, 247 A.2d 390 (1968); Article 57, Section 14 of the Code. However, in order properly to decide whether the appellees observed due diligence in attempting to ascertain that a fraud had been perpetuated on them, the nature of any fraudulent acts allegedly committed by the appellant must first be determined. Resolution of the statute of limitations issue, therefore, must await a redetermination of the question as to whether the appellant committed fraud *663 against any of the appellees and, more pertinently, the nature of the actions of the appellant which allegedly constituted such fraud.
Likewise, this Court cannot properly address itself to the question of whether the trial court improperly awarded punitive damages until the nature and scope of any fraud which the appellant allegedly practiced on the appellees has been determined. We do note, however, that punitive damages should only be allowed "in an action of deceit ... where the wrong involved some violation of duty springing from a relationship of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfulness...." Fowler v. Benton, 245 Md. 540, 552, 226 A.2d 556 (1967), cert. denied, 389 U.S. 851 (1967). To that end, as we specify below, the Court has requested that the trial court, in any memorandum opinion it subsequently may file in this case, set forth the grounds or basis of any award of punitive damages against the appellant which it may make. Rule 18 c.

III

PROCEDURE ON REMAND
In the interest of expediting the proceedings on remand, and assisting the trial court and the litigants in the conduct of those proceedings, we specify the following procedures to be observed when, following remand, the case is resumed in the court below.
First, the trial judge shall determine whether he is in a position to decide the case under the "clear and convincing" standard of proof without the necessity of ordering a new trial.
Second, if he determines that a new trial is not necessary, the trial judge shall require the opposing parties to submit proposed findings of fact, accompanied by memoranda of law, in which the parties shall specify those particular actions of the appellant which are *664 claimed by the appellees, on the one hand, to constitute fraud, and, on the other hand, are defended by the appellant as neutral or non-fraudulent in nature.
Third, in any memorandum opinion it may file, the trial court shall make findings of evidentiary and ultimate facts and shall specify, should it determine that the evidence of alleged fraud satisfies the clear and convincing standard, those actions of the appellant which it finds constitute fraud under that standard as to each of the individual appellees.
Fourth, if the trial court should find fraud on the part of the appellant growing out of an alleged confidential or fiduciary relationship between the appellant and any of the appellees, he shall specify the facts which he finds gives rise to that relationship.
Fifth, if the trial judge should award any punitive damages, in his memorandum opinion he shall specify, as required by Rule 18 c, the grounds on which he has determined such exemplary damages.
Judgment vacated and case remanded for further proceedings in accordance with this opinion; assessment of costs to await final disposition.
NOTES
[1] Appellees' suit is more accurately classified as a common law action for deceit, the foundation of which "is actual fraud ...." Babb v. Bolyard, 194 Md. 603, 609, 72 A.2d 13 (1950).
[2] The trial court's adoption of the preponderance standard may be explained by the fact that the memoranda submitted by the opposing parties in the court below were silent as to the standard of proof to be applied. Especially enigmatic was the defendant-appellant's failure to call that standard to the attention of the lower court.